UNITED STATES, Appellee,

v.

Joseph L. MEDEIROS, Jr.,
Defendant–Appellant.

No. 89–1713.

United States Court of Appeals,
First Circuit.

Heard Dec. 4, 1989.
Decided March 2, 1990.

**14**

Mark M. Freeman (argued), with whom Rappaport, Freeman & Pinta, Boston, Mass., was on brief, for defendant-appellant.

Martin F. Murphy, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, and COFFIN and BOWNES, Senior Circuit Judge.

COFFIN, Senior Circuit Judge.

Joseph Medeiros, Jr. was indicted for conspiring to commit arson under 18 U.S.C. §§ 371 and 844(i). After discovery, he moved to dismiss the indictment for lack of jurisdiction, arguing that the government could not prove at trial that the object of the arson conspiracy was a building used in or affecting interstate commerce. After reviewing the government's evidentiary proffer, the district court denied the motion. 706 F.Supp. 91. The defendant then entered a conditional guilty plea, specifically reserving the right to appeal the issue.

At the sentencing hearing, the court rejected the recommendation of the presentence report and adopted the offense level calculated by the government. This calculation included an increase from the base level for arson based on a finding that the defendant's actions recklessly would have endangered others. The defendant objected to this increase.

On appeal we are asked to address both issues. We affirm.

I.

In early June 1988, Medeiros was telephoned by an undercover agent of the Bureau of Alcohol, Tobacco and Firearms (BATF), Terrence Barry. Barry represented that he was the owner of a commercial property and was in desperate financial circumstances. He claimed that a mutual friend had told him that Medeiros could put him in touch with an arsonist. Barry reported that the insurance on his property was to run out on July 1, and that he needed the property burned before that time. Medeiros initially declined to get involved.

He was approached again in person by Barry two weeks later, June 16, 1988. After listening to Barry's pleas that he was "against the wall," Medeiros agreed to contact his friend and took a deposit of $500. Barry described the property as an old brick factory building that he had intended to convert. He indicated that the building was used for storage and that there was nothing nearby. He stated that "people don't even walk through there." Appendix at 30. At the time of these initial representations, the property described was a purely fictitious site invented by Barry.

Medeiros spoke with the arsonist on Monday, June 20. He told Barry to expect a call the next morning. At nine-thirty Tuesday morning, the arsonist called Barry. In this conversation, Barry described the building: "It's it's [sic] storage it's commercial, ah there's a vacant lot next to it." Appendix at 43. Barry indicated that the building was currently leased to a container company, although that tenant was to leave on Friday. The arsonist told him it

probably would cost less than $5,000, although he reserved making a price commitment until after viewing the building. He declined to meet Barry, insisting that all contact occur between Medeiros and Barry.

Later the same day, Barry and Medeiros had three telephone conversations about the timing of the arson. The arsonist refused to commit himself to a specific day and time, and negotiations temporarily broke down. Barry made arrangements to pick up the deposit from Medeiros on June 24.

During the June 24 meeting, Barry agreed to the condition set by the arsonist for the timing of the arson, i.e., that the event would occur on one of three days in the next week. Medeiros then asked some specific questions about the property. Barry told him it was an old oil-soaked wooden warehouse. He indicated that the packaging company was moving out that day. He described the building, drawing a diagram that showed the entrance, overhead doors, electric panel and an electric heat source. The diagram also showed the location of the street and the nearest occupied house. When Medeiros asked how many feet from the building the house was, Barry responded, "It's close, it's close." Appendix at 73. He also indicated that there were windows, but that they were boarded up. He stated that it was a ninety year old building with a granite slab basement. In the corner of the basement was a heating system that was shut down. Barry told Medeiros that the building would be empty, with the exception of "a couple of snowblowers" and some pallets.

The building Barry described and sketched at this meeting was an actual warehouse owned by the Globe Bag Company, a company buying supplies and selling finished products interstate. During the negotiations, the government had secured the use of this building as a supposed target, to show the arsonist, if necessary. The government offered to prove that the building was being used by the Globe Bag Company to store certain equipment, including the snowblowers described by Barry.

On Monday, June 27, Barry twice called Medeiros at work. During these conversations, Medeiros expressed concern that Barry had not heard from the arsonist. Medeiros similarly had not been contacted. They agreed, however, to meet at noon the next day and visit the site. Medeiros anticipated that he would be in contact with the arsonist soon.

When they met the following day, however, Medeiros informed Barry that his friend had "dropped from the face of the earth." Appendix at 85. Nevertheless, Medeiros told Barry that he expected the arsonist to reappear after Medeiros had viewed the property. Barry and Medeiros got into Barry's car and headed for the building. The BATF agents made a decision to close the operation while Barry and Medeiros were on their way to the property. Medeiros was arrested before actually viewing the building.

## II.

In order for Medeiros to be found guilty, the government had to prove, among other things, that the building he conspired to burn was "used in interstate . . . commerce or in any activity affecting interstate . . . commerce." 18 U.S.C. § 844(i). The district court found that the government offered proof from which a jury could find this connection on either of two theories. First, a jury reasonably could believe that the defendant actually thought he was contracting to burn a commercial building which, if it existed, would have been used in an activity affecting interstate commerce. Alternatively, the jury could have found that an actual building was the target of the agreement and was used in an activity affecting interstate commerce at the relevant time. We find sufficient evidence in the record to support a finding of a connection to interstate commerce under the first theory, and therefore do not reach the government's alternative approach.

As Medeiros admits, the fictitious nature of the object of a conspiracy (and thus the impossibility of the conspiracy being successfully concluded) does not pre-

clude finding federal jurisdiction. In *United States v. Giordano*, 693 F.2d 245, 250 (2d Cir.1982), the Second Circuit held that the character of a building as described to a conspirator can provide the necessary interstate connection.

> Jurisdiction is established by proof that the accused planned to commit a substantive offense which, if attainable, would have violated a federal statute ... [A] 'misapprehension' by the conspirators as to facts that make it impossible for them to commit the crime that is the object of the conspiracy does not make the conspiracy less culpable.

*Id.* at 249–250. *Cf. United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Waldron,* 590 F.2d 33, 34 (1st Cir.1979). Thus, if the building as described would have been connected sufficiently to interstate commerce if it existed, the fictitious building falls within the ambit of the statute.

█ To establish jurisdiction under § 844(i), the government need show only a *de minimis* connection to interstate commerce. *See, e.g., United States v. Schwanke,* 598 F.2d 575, 578 (10th Cir. 1979); *United States v. Sweet,* 548 F.2d 198, 202 (7th Cir.1977). The language of § 844(i) "expresses an intent by Congress to exercise its full power under the Commerce Clause." *Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985).

█ In *Russell,* the Supreme Court found that Congress' power under the Commerce Clause and its intent in enacting § 844(i) brought an apartment building involved in strictly local rentals within the statute. The Court found that "the rental of real estate is unquestionably ... an activity [affecting interstate commerce].... [T]he local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id.*

*Russell* thus holds that rental property is *per se* property used in an activity affecting interstate commerce. *Russell,* 471 U.S. at 862, 105 S.Ct. at 2457; *United States v. Patterson,* 792 F.2d 531, 534 (5th Cir.1986). After *Russell,* if the property to be burned is in the rental market, it is unquestionably sufficiently connected to interstate commerce to confer jurisdiction.

█ In the instant case, the indictment charged Medeiros with a conspiracy beginning June 16, 1988 and continuing through June 28, 1988. On June 16, agent Barry made it clear to the defendant that the property was being rented. Although the fictitious renter was to have moved on June 24, Medeiros at the least was conspiring to burn property actually being rented from June 16 through June 24. He accepted a deposit of $500 toward the arson on June 16. A jury therefore could find that the object of the conspiracy was in the rental market during the period of the charged offense.

The tenant's departure, moreover, did not necessarily sever the property's ties to interstate commerce for purposes of § 844(i). Unquestionably, there will be some point in time when a property that in the past has been used in an activity affecting interstate commerce, but which no longer operates in such activities, will lose its connection. In this case, however, a jury finding of continuing interstate connection would be supported by substantial precedent.

In *United States v. Patterson,* 792 F.2d 531 (5th Cir.1986), the Fifth Circuit discussed the statutory requirement that the property be "used." In determining that a building still under construction could meet the interstate commerce requirement, the court rejected the argument that contemporaneous use of a building was necessary under the statute. Instead, the court held that "the proper interpretation of the word 'used' in the statute merely requires 'some relationship,' some connection, to an activity affecting interstate commerce." *Patterson,* 792 F.2d at 534 (quoting *United States v. Andrini,* 685 F.2d 1094, 1095 (9th Cir.1982).

Similarly, the court in *United States v. Doby,* 872 F.2d 779 (7th Cir.1989), held that the attempted arson of a vacant two-unit rental apartment building fell within the statute. The upper rental unit had been

empty for six months, although a sign advertising its availability continued to appear until the time of the arson. The lower unit had been owner-occupied until it became unfit through damage from a burglary. The district court, whose opinion was adopted by the Seventh Circuit, held that "property routinely used in interstate-commerce activity does not lose its interstate *use* simply because of a temporary cessation of that activity." *Doby*, 684 F.Supp. 558, 561 (N.D.Ind.1988) (emphasis in original).

Other courts have agreed. The Fourth Circuit, in *United States v. Grossman*, 608 F.2d 534 (4th Cir.1979), held that a backhoe that had been located in the same state for two and one-half years and that was not currently being used in interstate business nevertheless met the interstate commerce requirement because it had been purchased out of state, was financed and insured out of state, was previously owned by two companies residing out of state and was currently being offered for sale in an out-of-state publication. The court rejected the argument that "§ 844(i) requires a contemporaneous connection with interstate commerce without regard to past interstate movement." *Grossman*, 608 F.2d at 536.

In *United States v. Belcher*, 577 F.Supp. 1241, 1243 (E.D.Va.1983), the court held that a restaurant that was closed temporarily did not lose its character as a building used in an activity affecting interstate commerce where there was no indication that such connection was being discontinued. The court noted that the owner had mentioned reopening at some point, though no specific plans were extant. Following *Grossman*, the court held that the contemporaneous connections to interstate commerce were not the only ones relevant to a determination that the building was sufficiently linked to interstate commerce. *See also United States v. Hermes*, 847 F.2d 493, 496 (8th Cir.1988) ("[t]hat the building was not currently occupied by a tenant does not detract from its character as commercial property").

Medeiros argues that these cases all rest on some advertisement for rental or antici-

pated future use in an activity affecting interstate commerce. However, at least in *Doby*, 684 F.Supp. at 560, the owner's representations that he intended to let the building in the future were of necessity limited by the understanding that this intent expired once he decided to burn the property. Such statements are akin to Barry's statement that the property was one he had planned to convert. Appendix at 24. As we read these cases, each court specifically ruled on the broader ground that strictly contemporaneous connections were not required to meet the interstate commerce requirement.

In the instant case, the building as described was rented for the major part of the period of the charged conspiracy. Unlike most of the cases we have discussed, the cessation of active rental occurred during the period of the conspiracy, not some time before. No significant break occurred, therefore, in the connection to interstate commerce, and the break was connected to the planned arson itself. Moreover, Barry never indicated to Medeiros that he intended to take the property out of the rental market. We think that there was adequate evidence for a jury to find that the fictional property was used in an activity affecting interstate commerce throughout the time of the charged conspiracy. Having reached this determination, we need not discuss the government's alternative theory.

### III.

We must affirm the district court's decision to make an adjustment to the base offense level if it is not clearly erroneous. *United States v. Wright*, 873 F.2d 437, 444 (1st Cir.1989). After reviewing the guidelines and commentary, we conclude that the district court's decision to increase the offense level was not clear error.

Two sentencing guideline sections govern this offense, § 2X1.1 (conspiracy) and § 2K1.4 (arson). The conspiracy guideline, § 2X1.1, states that the offense level for conspiracy is "[t]he base offense level from the guideline for the object offense, plus any adjustments from such guideline for

any intended offense conduct that can be established with reasonable certainty." Section 2K1.4(a) provides a base offense level of six for arson. Section 2K1.4(b), describing specific offense characteristics, allows an increase of 14 levels "if the defendant recklessly endangered the safety of another." Sentencing Guidelines § 2K1.4(b)(2).

The structure of the arson guideline requires a judge to consider the nature of the arson or attempted arson in setting the offense level. As the commentary for the guideline indicates, the Sentencing Commission considered the variability of arson cases in establishing the guideline:

> Review of presentence reports indicates that many arson cases involve 'malicious mischief,' i.e., minor property damage under circumstances that do not present an appreciable danger. However, aggravating factors are provided for instances where a defendant knowingly or recklessly endangered others, destroyed or attempted to destroy a residence, used fire or an explosive in the commission of a felony, used a destructive device, or otherwise endangered others.

Sentencing Guidelines § 2K1.4, Commentary, Background. The guideline therefore set a low base offense level and provided substantial upward adjustments for factors that aggravate the seriousness of the arson. The district court reviewed the seriousness of the arson Medeiros conspired to commit and concluded that he specifically intended a fire that recklessly would endanger others. He therefore upwardly adjusted the base level by fourteen levels.

Medeiros argues that the upward adjustment was clear error because the conspiracy was far from complete; thus, reckless endangerment was not established with reasonable certainty. He further claims that his intent recklessly to endanger could not be found with reasonable certainty because he did not know how far the residence was from the contemplated target, and because, early in the conspiracy, the

government led him to believe that the property was unoccupied and located near no other buildings. Based on these factors, he claims that the presentence report correctly concluded that the applicable offense level was six.

■ As we noted, for conspiring to commit arson, a defendant is sentenced using the base offense level, with adjustment for specific offense characteristics that can be determined with reasonable certainty. Sentencing Guidelines § 2X1.1. The commentary provides examples that help define reasonable certainty:

> [T]he only specific offense characteristics from the guideline for the object offense that apply are those that are determined to have been specifically intended or actually occurred. Speculative specific offense characteristics will not be applied. For example, if two defendants are arrested during the conspiratorial stage of planning an armed bank robbery, the offense level ordinarily would not include aggravating factors regarding possible injury to others, hostage taking, discharge of a weapon, or obtaining a large sum of money, because such factors would be speculative. The offense level would simply reflect the level applicable to robbery of a financial institution, with the enhancement for possession of a weapon. If it was established that the defendants actually intended to physically restrain the teller, the specific offense characteristic for physical restraint would be added. In an attempted theft, the value of the items that the defendant intended to steal would be considered.

Sentencing Guidelines § 2X1.1, Application Note 2. These examples highlight that the question of reasonable certainty goes to what with reasonable certainty can be determined to be the conspirator's intent. The fact that additional necessary acts were required to complete the conspiracy does not render the contemplated outcome "speculative" within the meaning of the commentary.[1]

---

1. In fact, a different part of the conspiracy guideline takes this factor into account by authorizing the reduction of the base offense level by three levels where all acts necessary to complete the conspiracy have not yet occurred. Sentencing Guidelines § 2X1.1(b)(2).

The examples further show that the sentencing commission contemplated examining the actual plan of the conspirators to determine which specific characteristics of the offense they intended. Thus, in the example, if the conspirators intended to use a weapon or take hostages, or planned to steal something worth $1 million, these characteristics of the crime would be factored into the offense level.

■ In this case, it can be determined with reasonable certainty that Medeiros conspired to burn a building of a particular configuration that was proximate to a residential building; he did not conspire, for example, to burn an abandoned barn in the middle of a field. The real question becomes whether there was sufficient evidence for the court to determine that the location of the building as described and depicted and the nature of the fire as planned would, with reasonable certainty, recklessly have endangered the occupants of the residence or the firefighters called upon to control the fire.

Although Medeiros is correct in asserting that agent Barry originally led him to believe that burning the building would pose no danger to others, Barry described the building and drew a diagram for Medeiros on June 24, four days prior to their final meeting and Medeiros' arrest. At the June 24 meeting, the transcript reveals the following conversation:

TB [Terrence Barry]: Okay, ah the closest occupied house, unfortunately is right around in here.

JM [Joseph Medeiros]: How many feet between?

TB: It's close, it's close.

JM: How close?

TB: With an ally [sic] here....

Appendix at 73. Agent Barry drew a diagram as he described the property. That diagram also reveals that the residence was near the building to be burned. While Medeiros could not know precisely how close the residence was, he had a clear indication that it was "close." Moreover, at the same meeting Barry described the building as flammable, saying, "It's all wood ... wood. It's an old oil soaked warehouse." Appendix at 72.

Medeiros also informed Barry that the arsonist had already purchased materials required for the arson:

JM: He's already bought the stuff.

He already, he told me Sunday night, like, like he's dumped out a ton of money.

TB: What do you mean?

JM: On supplies to do this.

TB: Go down to the Exxon station, buck and a half.

JM: No this is going to be extremely, um inventive.

TB: What's this like fourth of July in Sough [sic] Boston or something?

JM: Ya.

TB: Ha, ha.

Maybe I should stick around and watch it.

JM: Ya, I mean it's it would almost be a good show.

Appendix at 100. The district court reasonably could have understood this passage to mean that the arsonist contemplated a major conflagration. Medeiros' subsequent descriptions of conversations with the arsonist reinforce this conclusion:

JM: I once asked him, I says ah ... I read something about how to blow up a car. You take a little bottle of um medicine pills ... Metal oxide or something in it um.

.     .     .     .     .

You stuff it into the gas tank, the gas will eat through the plastic in about a half hour and the car will explode.

.     .     .     .     .

And he just looked at me, he says, how childish?

Let me tell you how to really get that sucker to flow [sic] up, and then he went into this elaborate scheme, he says you know you'll have parts a mile up, a mile away this thing will go so high.

Then he tells me how to kill somebody go into their house and take their shaving cream, you put this in it when they shave, the water hits it, they're gone.

Appendix at 101. Taken together, the district court could conclude that Medeiros knew he was conspiring to cause a spectacular fire in an oil-soaked wooden warehouse separated only by an alley from an occupied residence that recklessly would endanger the occupants of that residence.

Moreover, the district court reasonably could conclude that the major fire Medeiros contemplated recklessly would endanger the lives of the firefighters required to extinguish it. We recognize that all fires present some danger to firefighters, and the risks of a minor fire have presumably been factored into the base offense level. However, this was not a conspiracy involving " 'malicious mischief,' i.e., minor property damage under circumstances that do not present an appreciable danger." Sentencing Guidelines § 2K1.4, Commentary, Background. A finding of reckless endangerment in this case would not be unduly speculative. Where a spectacular fire is planned near an occupied building, a finding of reckless endangerment to firefighters would be based on a common sense understanding of the risks of putting out a major fire when rescue attempts are likely to be necessary.

On these facts, we hold that the district court did not commit clear error in finding that Medeiros specifically intended to cause the kind of fire that recklessly would endanger others. The court reasonably could conclude that the fire as planned would present substantial danger to the occupants of the residence next to the warehouse and to firefighters called in to control the blaze.

■ At oral argument, Medeiros offered a final challenge to the increase. The arson guideline, in addition to the provision for reckless endangerment, includes a separate specific offense characteristic for circumstances where "the defendant endangered the safety of another." Sentencing Guidelines § 2K1.4(b)(5). The increase for simple endangerment as opposed to reckless endangerment is four levels instead of fourteen.

Medeiros argues that the commentary to Sentencing Guideline § 1B1.1 suggests that this lesser increase, if any, should be applied. That commentary provides:

> The offense level adjustments from more than one specific offense characteristic within an offense guideline are cumulative (added together) unless [as in the arson guideline] the guideline specifies that only the greater (or greatest) is to be used. Within each specific offense characteristic subsection, however, the offense level adjustments are alternative; only the one that best describes the conduct is to be used.

Sentencing Guidelines § 1B1.1, Application Note 4.

As Medeiros states, this note requires that the factor that best describes the conduct be used to adjust the offense level. But the arson commentary indicates that where more than one specific offense characteristic applies, the greatest shall be used. Sentencing Guidelines § 2K1.4(b). As we have already stated, reckless endangerment could have been found.

It always will be the case that where reckless endangerment is found, simple endangerment even more clearly will appear. The guidelines do not contemplate that the lesser increase is always more appropriate because it is more certain. This would run contrary to the existence of multiple levels in the first instance.

As we noted before, our review of the district court's decision to adjust the base offense level is limited to clear error. We do not think that on the facts of this case we can say that the district court was clearly wrong.

*Affirmed.*