UNITED STATES of America,
Plaintiff–Appellee,

v.

James J. GUADAGNO, Defendant–Appellant.

No. 91–2233.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1992.

Decided July 8, 1992.

Joel D. Bertocchi, (argued), Office of the U.S. Atty., Crim. Div. and Barry R. Elden, Office of the U.S. Atty., Crim. Receiving, Appellate Div., Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Jeffrey B. Steinback, Marc W. Martin (argued), Genson, Steinback, Gillespie & Martin, and Joseph R. Lopez, Chicago, Ill., for defendant-appellant.

\* The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, is

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and NOLAND, Senior District Judge.\*

NOLAND, Senior District Judge.

This is a direct criminal appeal in which defendant-appellant James J. Guadagno challenges the district court's decision denying his motion for a new trial as well as the district court's application of the Sentencing Guidelines. We affirm.

## I. FACTUAL BACKGROUND

### A. *The Offense*

Prior to early 1988, defendant-appellant James J. Guadagno (hereinafter "Guadagno") was the owner of the Archer–Cermak Food and Liquor Store (hereinafter "the Archer–Cermak Store"), which was located at 2224 South Archer Avenue, in Chicago, Illinois. The Store sold a variety of different items including groceries, beer and wine, and rented videotapes. Guadagno also operated another store which was known as the Canal Street Store.

The Archer–Cermak Store was located in a one story building that was approximately fifty feet wide and seventy-five feet in length. Although it was situated in an urban setting, bordered by vacant lots and approximately two-hundred and sixty-three feet from the nearest residence, the Store was in a residential area. Guadagno leased the actual building from its owner (Louis Spalla) beginning in January of 1986, and had personally guaranteed the lease in the amount of $20,000. The lease included a provision permitting Guadagno to terminate the same and escape his personal guarantee if the building was damaged by fire and Spalla failed to effect repairs within ninety days.

Guadagno had purchased an insurance policy on the contents of the Store from the J.J. Eastman Insurance Company in April of 1986. The policy, which was underwritten by the American Economy Insurance Company (a subsidiary of American States

sitting by designation.

Insurance Company), became effective on April 11, 1986. Guadagno renewed the policy on April 11, 1987.

Business took a turn for the worse beginning in January of 1988, due in part to the closing of area factories. Guadagno made at least one late rental payment and bounced several checks. When he began to accumulate debt (his Canal Street Store owed $180,547.13 in state sales tax, penalties and interest, and he owed a balance of $35,000 on a bank credit line), Guadagno commented to his employees that he wished the Store would burn down. When efforts to sell his business failed, Guadagno asked the Archer–Cermak Store's manager (Richard David Bargas) if his fiancee's father (an Indiana manufacturer and distributor of class C fireworks) could "rig up" a time delay device to ignite the Store.

During March of 1988, Guadagno had his employees move several movie posters, which advertised videotapes that the Store rented, to the front windows. The placement of the posters on the front windows had the effect of blocking the view of passersby of the inside of the Store. During the same time period, Guadagno began moving the Store's videotapes to his Canal Street Store. Despite the fact that most if not all of the videotapes had been removed and were *not* being rented to the Store's patrons, Guadagno told his manager to "ring up" videotape rentals on the one of Store's cash registers to mask his physical removal of the videotapes to the Canal Street Store.

In early April of 1988, Guadagno's insurance agent telephoned Guadagno to remind him that it would soon be necessary to renew the Archer–Cermak Store's insurance policy. Despite an April 11, 1988 renewal deadline, Guadagno did not renew his policy at that time. Instead, Guadagno asked his agent to check with other insurance companies for a more competitive rate. On the date of the fire, Guadagno had not made any premium payments toward a new or renewed policy.

On April 8, 1988, Guadagno deviated from his usual routine of not working at the Archer–Cermak Store on Friday nights. Upon his arrival at approximately 10:00 p.m., he instructed his employees to total the Store's cash registers because the Store would be closing early (i.e., prior to 11:00 p.m.). As per Guadagno's instructions, Bargas gave him the Store's receipts (the money from the registers) rather than placing them in the safe. Guadagno would later inform the insurance adjuster that the day's receipts were in the safe. The stockboy responsible for taking out the trash, which consisted mostly of cardboard boxes that had been left in a pile, was told to leave it by the rear door. Guadagno was alone in the Store at approximately 10:15 p.m.

Approximately forty-five minutes later, Rose Herron, who made a purchase and left the Archer–Cermak Store just prior to its closing, was using the pay telephone which was approximately two feet from the front of the Store when she noticed a brown-beige Cadillac idling at the Store's front curb. Herron then noticed a man, whom she would testify she recognized as the Store's owner (Guadagno), exiting from the Store with a box and driving off hurriedly.[1] Approximately one minute later, after she had finished her telephone call and walked back across the street, there was an explosion inside the Store. Herron heard the explosion and immediately telephoned 911.

The twenty-seven firefighters who responded to the 11:02 p.m. emergency call discovered that nearly the entire rear wall of the Archer–Cermak Store had been "blown out across the street" and was laying in pieces. The force of the explosion was apparently so great that it extinguished most of the fire. Relief Battalion Chief Edward Kelly, the chief firefighter on the scene, discovered two full gasoline cans, one full kerosene can, propped-open refrigerator display cases, and embers and

---

**1.** Herron testified that she had observed the individual known as "Jimmy" and an employee loading videotapes into a box earlier that evening. This is the one key portion of Herron's testimony which Guadagno highlights as inconsistent with the testimony of other government witnesses, who asserted that the videotapes had been removed days before the fire.

sparks in the area of the fire. Kelly immediately ordered his firefighters to retreat.

Subsequent investigation by fire cause and origin experts revealed a low burn pattern which suggested that a flammable liquid had been poured on the Store's floor. The experts concluded that the fire had been intentionally set. After the fire, Guadagno made several statements to investigators which were inconsistent with what was found at the scene (e.g., while Guadagno stated that he had locked the rear door when he left, it was found unlocked).

While Guadagno had removed several hundred videotapes from the Archer–Cermak Store, and had allowed the Store's inventory to drop prior to the fire, Guadagno later met with his employees and instructed them to indicate that the Store was fully stocked at the time of the fire. When asked by Jeanne Castellano whether he had set the fire, Guadagno replied "[y]our father [the fireworks manufacturer/distributor] would be proud." Guadagno informed Bargas and his co-employee/fiancee that they should keep their stories straight. He also informed several of the Store's employees (including Bargas and Laurie Schillaci) what to say when they testified before the Grand Jury.

On April 14, 1989, Guadagno met with his insurance adjustor and informed him that there had been approximately four-hundred (400) videotapes in the Store at the time of the fire, that the day's receipts were in the safe, that he had *not* been involved in the fire, and that he estimated his total loss to be approximately $127,000. Guadagno later completed an insurance form claiming $140,000 in losses, and stating that he had not been involved in the fire. Needless to say, Guadagno's insurance claim was never paid.

#### B. *Trial and Presentence Investigation*

On January 25, 1990, Guadagno was charged by way of a five count indictment. Count I charged him with arson pursuant to 18 U.S.C. § 844(i). Counts II through IV charged him with mail fraud pursuant to 18 U.S.C. § 1341. Count V charged Guadagno with obstruction of justice pursuant to 18 U.S.C. § 1503.

On September 10, 1990, Guadagno's jury trial began. The jury returned its verdict finding Guadagno guilty on Counts I through IV, and not guilty on Count V (the obstruction of justice count) on September 20, 1990. Thereafter, the district court entered judgment on the jury's verdict and referred the matter to the Probation Department for a presentence investigation. On October 30, 1990, the district court denied Guadagno's "Motion for Judgment of Acquittal Pursuant to Rule 29(c) and Motion in Arrest of Judgment or in the Alternative a New Trial" and his Supplemental Motion for a New Trial.

On or about March 4, 1991, Guadagno's Presentence Investigation Report was distributed to the parties. The Report included recommendations by Guadagno's probation officer that (1) his offense level be increased by fourteen levels for recklessly endangering the safety of others, pursuant to Guideline § 2K1.4(b)(2), and (2) Guadagno receive a two point reduction in his offense level for his acceptance of responsibility, pursuant to Guideline § 3E1.1. The latter recommendation was based upon Guadagno's first written statement, which was reproduced in the Presentence Investigation Report, in which he purported to accept responsibility for his criminal acts. In due course, the parties objected to the portions of the Report which were adverse to their respective positions.

On March 27, 1991, the Probation Department submitted Guadagno's second written statement in which he again purported to accept responsibility for his criminal conduct. On March 29, 1991, the district court heard oral argument on the parties' objections.

#### C. *Sentencing Hearing*

On May 17, 1991, Guadagno was sentenced pursuant to the Sentencing Reform Act of 1984. On the same day, Judge Williams filed a written Opinion resolving the issues presented under the Sentencing Guidelines. *See United States v. Guadagno*, 766 F.Supp. 617 (N.D.Ill.1991). Judge

Williams concluded, *inter alia*, that Guadagno was not entitled to a two point reduction in offense level for acceptance of responsibility, and that his base offense (Count I of the indictment) should be increased by fourteen points for recklessly endangering the safety of others. *United States v. Guadagno, supra*, 766 F.Supp. at 618–620.

Judge Williams stated that an acceptance of responsibility credit was inappropriate because Guadagno had not fully accepted responsibility for his acts and because his purported acceptance came too late in the proceedings. *Id.* In rejecting Guadagno's argument that a fourteen point increase of his base offense level was not justified under the circumstances, Judge Williams found that while Guadagno closed the Store early, he had waited only a short time thereafter before setting the fire. *Id.* Judge Williams also found that although there were no employees in the Store when the fire was started, it was started only two minutes after the Store's normal closing time and could very well have injured any individual who arrived at that time *expecting to find the Store open.* In this regard, the district court deduced from the fact that flammable liquids had been poured throughout the area and that coolers had been left open to provide oxygen to the fire, that Guadagno had intended to set a "major fire." *Id.*, 766 F.Supp. at 620.[2]

Prior to the district court's imposition of sentence, one of Guadagno's appellate counsel addressed the issue of Guadagno's acceptance of responsibility:

> I should say—and it's probably restating the obvious—that his statements, of course, were made and prompted by his conviction. Had he been acquitted he would not be making the statements. And certainly they are prompted by his

fear over an uncertain future, fear over losing his touch with his family.

Supplemental Record, pp. 6–7.

Based upon an offense level of twenty-one, and a criminal history score of I, Guadagno's sentencing range was found to be thirty-seven to forty-six months. Ultimately, the district court imposed four concurrent thirty-eight month terms of imprisonment to be followed by a three year term of supervised release during which Guadagno was to perform community service. Guadagno timely filed his Notice of Appeal on May 24, 1991.

## II. ANALYSIS

### A. *Government Witness' Allegedly Uncorrected Perjured Testimony*

■ Guadagno argues that he is entitled to a new trial because Rose Herron, the only government witness to place him at the scene moments before the fire and explosion, testified falsely and without correction by the government. Guadagno argues that Herron's testimony concerning the date and time he allegedly removed the videotapes from the Archer–Cermak Store was at odds with the testimony of several of the government's witnesses, a fact the government should have known from its pretrial preparation.[3] Guadagno notes that when a government witness gives false testimony, the government is not permitted to "sit on its hands"—it must attempt to rectify the situation. *Appellant's Brief*, pp. 9–13 (*quoting United States v. Wallach*, 935 F.2d 445, 457 (2d Cir.1991)). Guadagno further notes that a defendant convicted as a result of the government's knowing use of false testimony is entitled to a new trial if there is a reasonable likelihood the testimony could have affected the jury's judgment. *Appellant's Brief*, p. 12 (*quoting United States v. Bagley*, 473 U.S. 667, 678,

---

**2.** Senior Fire Marshal Donald Rimgale testified that by using a combination of gasoline and diesel fuel, Guadagno created a "hotter fire" than if he had used gasoline alone.

**3.** Guadagno's trial counsel emphasized the issue of Herron's allegedly conflicting testimony during closing arguments:

> Do you remember she said that she saw videos being loaded that night at the store, loaded into a box? Remember that was her direct examination? And we know that didn't happen because nobody else told us that. She's the only one that said that.

R. 738.

105 S.Ct. 3375, 3381–3382, 87 L.Ed.2d 481 (1985)).

The government argues that by failing to call this matter to the district court's attention, Guadagno has waived consideration of his argument that he is entitled to a new trial. On the merits, the government argues that Guadagno has not established that Herron intentionally committed perjury or that her testimony could have misled the jury. Guadagno submits that the government's waiver argument is without merit because the government elicited the false testimony and he had no duty to object. While we find Guadagno's response to the government's waiver argument to be wanting, we will proceed to the merits which have been fully briefed.

The standard of review which is applied in reviewing the denial of a motion for a new trial which is based on the prosecution's alleged use of perjured testimony was summarized in succinct fashion in *United States v. Douglas,* 874 F.2d 1145, 1159–1160 (7th Cir.), *cert. den. sub nom.* 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989):

> We review the denial of a motion for a new trial based on the prosecution's alleged use of perjured testimony under an abuse of discretion standard. *United States v. Kaufmann,* 803 F.2d 289, 291 (7th Cir.1986). We will not disturb the trial court's ruling on the motion "unless there has been an error of law or a clear and manifest abuse of judicial discretion." *Kaufmann,* 803 F.2d at 291 (quoting *United States v. Nero,* 733 F.2d 1197, 1202 (7th Cir.1984)).

> A new trial should be ordered, on the basis of the prosecution's use of perjured testimony, if the defendant establishes that 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury. *Kaufmann,* 803 F.2d at 291. *See Napue v. Illinois,* 360 U.S. 264, 269–71, 79 S.Ct. 1173, 1177–78, 3 L.Ed.2d 1217 (1959).

Applying this standard to the facts of the present case, we conclude that the district court did not err in denying Guadagno's Motion for New Trial. Guadagno has simply failed to prove that Herron's testimony constituted perjury (which dispenses with the first requirement and, by implication, the second requirement of the above test) or, for that matter, that there exists a reasonable likelihood that her testimony could have affected the jury's verdict (the third requirement). The record demonstrates that Herron's testimony was not necessarily false or inconsistent with the testimony of the government's other witnesses. Herron testified that at approximately 9:30 p.m. on the night of the fire she went to the Archer–Cermak Store to purchase a soda and make a telephone call when she observed the Store's owner (Guadagno) and an employee "loading some videotapes inside a box." Herron testified that at approximately 11:00 p.m., she observed the owner exit from the Store with a box, place the box in the back seat of his Cadillac, and drive off "in a hurry." While several of the government's witnesses testified that the videotapes were removed prior to the date of the fire, their testimony did not necessarily conflict with Herron's testimony, as the videotapes could merely have been removed on different days. Laurie Schillaci testified that although she helped Guadagno pack up the Store's videotapes approximately one week before the fire, "a handful" of videotapes that had been checked out the previous week (and some even before that) were returned to the Store immediately before the fire. R. 408–411, 423. The other government witnesses' testimony did not exclude the possibility that several videotapes were returned late. Bargas explained, for example, that his testimony that there were no videotapes remaining in the Store at the time of the fire was based upon the fact that he had not observed any videotapes in the drawers where they were ordinarily stored. Finally, given the quantum of direct and other circumstantial evidence which supported the jury's verdict, it is not likely that Herron's testimony, even assuming the same was false, "affected the judgment of the

jury." Guadagno's remaining attacks on Herron's testimony do not merit discussion.

## B. *Fourteen Point Reckless Endangerment Enhancement*

Guadagno also argues that the district court erred in increasing his base offense level by fourteen points for recklessly endangering the safety of others because (1) there is no evidence that he "consciously sought to harm any other individual," (2) he took precautions to safeguard others (such as blocking the Cermak entrance to the Store with two dumpsters), and (3) the location[4] of the Archer–Cermak Store was such that it would have been unlikely that a fire would have spread or that he would have endangered other individuals. As for the district court's observation that last-minute shoppers could have arrived at the time of the fire, Guadagno replies that they would have had to break-in because the Store was closed. Guadagno attempts to explain away the district court's finding that Herron was endangered, by attacking her credibility and the plausibility of her testimony. Finally, Guadagno argues that all fires present a risk to firefighters, and that the firefighters in the present case could not have been endangered because the fire did not penetrate the protective shield of their equipment.

The burden of proving a specific-offense characteristic justifying an enhancement of the defendant's sentence is on the Government. *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991). The question of whether a given specific-offense characteristic applies is of course inherently fact-specific. *United States v. Bader*, 956 F.2d 708, 710 (7th Cir.1992); *United States v. Day*, 943 F.2d 1306, 1308, 1310 (11th Cir.

1991), *cert. den.* —— U.S. ——, 112 S.Ct. 1196, 117 L.Ed.2d 437 (1992).

Sentencing Guideline § 2K1.4, which is known as the arson guideline, provided at the time of Guadagno's offense and conviction[5] that "[i]f the defendant recklessly endangered the safety of another, [his basic offense level should be] increase[d] by 14 levels." In *United States v. Medeiros*, 897 F.2d 13, 18 (1st Cir.1990), the First Circuit discussed in general terms the arson guideline and its application:

> The structure of the arson guideline requires a judge to consider the nature of the arson or attempted arson in setting the offense level. As the commentary for the guideline indicates, the Sentencing Commission considered the variability of arson cases in establishing the guideline[.]
>
> . . . .
>
> The guideline therefore set a low base offense level and provided substantial upward adjustments for factors that aggravate the seriousness of the arson.

Although there were other specific offense characteristics which arguably applied to Guadagno's offense (i.e., specific offense characteristics which, had this version of the guideline still been in effect at the time of Guadagno's sentencing, would have permitted an enhancement of less than fourteen levels), the commentary to the arson guideline specifically provides that in those cases where more than one characteristic applies, the greatest is to be used. *See United States v. Medeiros, supra*, 897 F.2d at 20.

In reviewing a district court's adjustment of a defendant's base offense level under this guideline, we apply the following standard:

**4.** At the time of the fire there were vacant lots to the west and east of the Store, and a four lane street and "a prairie" behind the Store. The nearest residence was across a four lane street and was approximately two-hundred and sixty-three feet from the front of the Store.

**5.** As pointed out by Judge Easterbrook in his concurrence, the parties have focused their attention (as did the district court) on a version of the arson guideline which, while in effect at the

time of Guadagno's conviction, was no longer in effect at the time of his sentencing. Guadagno was sentenced on May 17, 1991, more than six months after the November 1, 1990 effective date of amendment no. 330 (which substituted a base offense level of twenty). This amendment, however, did not effect Guadagno's sentence (i.e., a base offense level of twenty would have resulted in the same sentence as a base offense level of six enhanced by fourteen levels).

To the extent that the sentencing determination turns on [a] question of fact, the district court's findings will not be disturbed unless we are left "with the definite and firm conviction that a mistake has been committed." [*United States v. Boyer*, 931 F.2d 1201] at 1204 [(7th Cir.1991)]; *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989); *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989). This deferential standard of review similarly applies to the district court's decision to adjust a base offense level under Guidelines § 2K1.4. *United States v. Medeiros*, 897 F.2d 13, 17 (1st Cir.1990)[.] ... By contrast, a question involving the interpretation of a Guidelines term is a matter of law subject to *de novo* review. *Boyer*, 931 F.2d at 1204; *United States v. Teta*, 918 F.2d 1329, 1332 (7th Cir.1990).

*United States v. Golden*, 954 F.2d 1413, 1416 (7th Cir.1992).

■■■ Guadagno's argument that there is no evidence he "consciously sought to harm any other individual," is unavailing. In this context, reckless endangerment requires proof that the defendant specifically intended to cause the type of fire that could endanger others, not that the defendant "consciously sought to harm [others]." *United States v. Golden, supra*, 954 F.2d at 1415–1416 ("[The defendant's] sole intention was that the Rainbow Market be completely destroyed in the flames; collateral damage and injury were, apparently, of little or no consequence."); *United States v. Medeiros, supra*, 897 F.2d at 20. Guadagno intended to destroy his business. In setting a major fire which was intended to accomplish that result, he acted without regard for the serious risk he created and recklessly endangered others.

Guadagno's argument that he took certain precautions to prevent injury to others also does not lead to the conclusion that the district court erred. The government is correct in its assertion that the "prophylactic measures" undertaken by Guadagno (such as his using two (2) dumpsters to block *one* of the entrances to the Store) did not eliminate the serious risk posed by what Guadagno clearly intended to be a major fire. The measures undertaken by Guadagno decreased, but certainly did not eliminate, the risk to others of injury or death. While Guadagno's effort to disable the telephone in front of the Store by inserting popsicle sticks into it may have decreased the amount of time a potential caller would have spent trying to use the telephone, this measure did not eliminate the risk which Guadagno created. As the government stated at oral argument, Guadagno would have had to remove the telephone altogether in order to guarantee that passersby would not attempt to use it.

■■■ Guadagno's argument that the location of the Store was such that the fire would not have been likely to spread thereby endangering other individuals, is also unavailing. Guadagno seeks to fit this case into the class of cases which the *Golden* Court suggested (*in dicta*) might not justify a § 2K1.4 enhancement. His argument is unconvincing. In *Golden*, Judge Kanne observed that:

In this day and age, the arson of an urban structure—whether residential or commercial—is virtually a per se reckless endangerment of others.

*Id.*, 954 F.2d at 1417. Judge Kanne qualified this statement, however, adding that:

Of course, the arson of an urban building which is *altogether isolated* may not present the same degree of danger to neighboring structures.

*Id.* (emphasis added). The flaw in Guadagno's analysis is obvious. First, the Archer–Cermak Store was not "altogether isolated," although it was certainly more so than in previous cases where this Court has affirmed application of the reckless endangerment enhancement. Second, even if the Store had been "altogether isolated," the reckless endangerment enhancement is not limited to only those cases involving defendants who start fires which could spread to neighboring structures, "recklessly endanger[ing] the safety of another" in the process. *Golden* does not suggest to the contrary.

The reckless endangerment enhancement is also applicable to those individuals, such

as defendant Guadagno, who start fires that recklessly endanger passersby, who may be expected to come within a short distance of the targeted structure (e.g., someone like Herron, who stops to use the telephone or a vending machine, or is simply standing outside of or walking by the building), or firefighters who are dispatched to the scene. In the present case, as the government's counsel suggested at oral argument, there were clearly two alternative grounds identified by the district court which justified the enhancement that had nothing to do with the Archer–Cermak Store's physical proximity to other buildings. Judge Williams found, and we agree, that the enhancement was justified because Guadagno recklessly endangered the safety of both Herron and the responding firefighters. Guadagno's use of flammable liquids in explosive quantities, as well as his decision to prop open the refrigerated display cases to introduce oxygen into the area where the fire would be burning, constituted compelling evidence of reckless endangerment. *United States v. Golden, supra,* 954 F.2d at 1416 (affirming reckless endangerment enhancement in part because the defendant had used dangerous combustibles "designed to ignite and spread fire quickly").

■ During oral argument, the defendant's counsel implicitly argued against any construction of Guideline § 2K1.4 which would permit its application where the only fact offered by the government in support of enhancement was that the defendant had set a fire which endangered firefighters. Counsel observed that in an urban setting "nearly all" fires endanger firefighters. While we agree with counsel's observation, we find his argument to be without merit.[6]

Paraphrasing the Ninth Circuit's holding in *United States v. Medeiros, supra,* 897 F.2d at 20, while "[nearly] all fires present some danger to firefighters, and the risks of a *minor* fire have presumably been

factored into the base offense level[,]" a district judge may enhance the sentence of a defendant who is convicted of setting a fire which represents a *greater* danger to firefighters, without requiring proof that other individuals (i.e., passersby) were also endangered. *Id.* (emphasis added). In *Medeiros,* the greater danger was represented by the fact that the defendant had planned a "spectacular fire near an occupied building." *Id.* The enhancement was found to be justified based upon "a common sense understanding of the risks of putting out a major fire when rescue attempts are likely to be necessary." *United States v. Medeiros, supra,* 897 F.2d at 20. In the present case, Judge Williams could have enhanced defendant Guadagno's sentence, even if the fire had not also endangered Herron, because Guadagno planned and set a fire which presented greater risks to the responding firefighters than a "minor fire." *See United States v. Day, supra,* 943 F.2d at 1311. The fire which defendant Guadagno set was so explosive that the Battalion Chief was compelled to order his firefighters to retreat.

### C. Denial of Two Point Acceptance of Responsibility Credit

Guadagno also argues that the district court erred in determining that he was not entitled to an acceptance of responsibility credit. Guadagno contends that the district court should have deferred to the probation officer, who met with Guadagno for the longest period of time and prepared his Presentence Investigation Report, and that the district court erred in requiring Guadagno's expression of guilt to meet such an exacting standard. Guadagno suggests that the district court erred in denying him a reduction in his offense level based upon the fact that he did not accept responsibility for committing mail fraud because the average person does not view mailing a letter as criminal and because the mail fraud counts were intertwined with the arson counts. Finally, Guadagno argues that

---

6. Guadagno's argument that the firefighters in the present case would not have been endangered because they wore protective equipment and the fire did not penetrate the protective shield of their equipment is ludicrous. The fact that the firefighters escaped injury is not relevant to whether they were initially at risk.

the district court used the fact that he went to trial to preclude an acceptance of responsibility credit. In this regard, Guadagno contends that the district court violated the *Ex Post Facto* Clause by applying an application note which was revised *after* Guadagno committed the charged offenses, and that he (Guadagno) was punished for exercising his constitutional right to trial.

Pursuant to Sentencing Guideline § 3E1.1(a), a defendant is entitled to a two point reduction in his offense level if he is able "[to] clearly demonstrate a recognition and affirmative acceptance of personal responsibility for his criminal conduct." [7]

Our review of a district court's decision that a defendant is not entitled to an acceptance of responsibility credit is governed by certain well-settled principles:

> We give great deference to a district judge's decision regarding a defendant's acceptance of responsibility under Guideline § 3E1.1(a) because " '[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.' " *United States v. Franklin,* 902 F.2d 501, 505 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990) (*quoting* United States Sentencing Commission, *Guidelines Manual,* § 3E1.1 Application Note 5). Moreover, the defendant bears the burden of demonstrating that he is entitled to the reduction. *United States v. Camargo,* 908 F.2d 179, 185 (7th Cir.1990). Therefore, we will reverse a district judge's determination of this issue only if it is clearly erroneous. *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989).

*United States v. Leiva,* 959 F.2d 637, 644 (7th Cir.1992); *accord United States v. Bafia,* 949 F.2d 1465, 1476 (7th Cir.1991), and *United States v. Knorr,* 942 F.2d 1217, 1223 (7th Cir.1991).

A district judge's determination that a defendant is not entitled to an acceptance of responsibility credit will be reversed only if it is clearly erroneous because "[t]he question of whether a defendant has accepted responsibility for his crimes is a factual one, depending largely on credibility assessments of the sentencing judge." *United States v. McGuire,* 957 F.2d 310, 317 (7th Cir.1992) (*quoting United States v. McKenzie,* 922 F.2d 1323, 1329 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991)).

■ Guadagno's argument that the district court should have deferred to the probation officer who prepared his Presentence Investigation Report is without merit. While a defendant's admission of involvement to an investigating probation officer provides *some* indication that the defendant is attempting to accept responsibility, *see United States v. Blas,* 947 F.2d 1320, 1330 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992), this Court has never held that a probation officer's recommendation that the two point credit should be awarded is entitled to special deference (a point Guadagno's appellate counsel conceded at oral argument). We are not aware of any authority which holds that a district court is bound by a probation officer's recommendation. *See United States v. White,* 875 F.2d 427, 431 (4th Cir.1989) (Wilkins, J.) ("The district court decision on whether to apply Guideline § 3E1.1 is not controlled by the presentence report recommendation[.]").

■ We also reject Guadagno's argument that the district court erred in denying an acceptance of responsibility credit which was based, at least in part, on Guadagno's failure to accept responsibility for all of his criminal acts. While, as Guadagno observes, the average person may not fully appreciate or be able to recite the statutory definition of mail fraud, Congress has criminalized, and Guadagno was convicted of having engaged in, conduct which falls within this definition. "A defendant 'accepts responsibility' only when he fesses up to his actual offense." *United States v. Trussel,* 1992 U.S.App.Lexis 6864, at *14 (7th Cir.1992) (*quoting United*

---

7. "The Application Notes for this section provide a non-exhaustive list of factors for the court to consider in making this determination."

*United States v. Knorr,* 942 F.2d 1217, 1222 (7th Cir.1991).

*States v. Escobar–Mejia,* 915 F.2d 1152, 1153 (7th Cir.1990)). Guadagno's acceptance of responsibility for only a portion of his criminal conduct was thus insufficient to justify this reduction in his offense level.

■ Judge Williams found not only that Guadagno had failed to accept responsibility for all of his criminal conduct, but also that his purported acceptance came too late in the proceedings, and that his characterization of the fire as a "needless mistake that happened to him" was hardly an affirmative acceptance. *United States v. Guadagno, supra,* 766 F.Supp. at 618.[8] With respect to lateness, Judge Williams found that Guadagno's first letter was not written until *after* he was convicted, and that his second letter was not written until *after* the government had objected to the probation officer's recommendation that the district court should award an acceptance of responsibility credit. *United States v. Guadagno,* 766 F.Supp. at 618–619 (*citing United States v. Franklin,* 902 F.2d 501, 505–506 (7th Cir.), *cert. den. sub nom.* —— U.S. ——, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990), and Guideline Application Note 1(g) and 2 to Guideline 3E1.1)).

We conclude that Guadagno's attempt to accept responsibility was in reality an effort to decrease his overall sentence. *United States v. Leiva, supra,* 959 F.2d at 644; *United States v. Blas, supra,* 947 F.2d at 1329–1330. The present case is strikingly similar to this Court's recent decision in *United States v. Leiva, supra,* 959 F.2d at 644, wherein the Court affirmed a district court's determination that the de-

fendant was not entitled to an acceptance of responsibility credit because his post-trial admission of guilt to his probation officer during his presentence investigation interview was untimely, and "motivated more by [his] concern to improve his potential disposition than by true remorse." *Id.* (*quoting United States v. Franklin, supra,* 902 F.2d at 506).[9] Similarly, in *United States v. Blas, supra,* the defendant waited until "just prior to [the] imposition of sentence" to make a "feeble attempt to accept responsibility." The *Blas* Court stated that it "d[id] not believe the defendant's last-minute desperation attempt to accept responsibility [wa]s a timely manifestation of such acceptance." *Id.,* 947 F.2d at 1330.

■ Addressing the issue of whether revised Application Note 2 penalized Guadagno for exercising his constitutional right to trial, the district court concluded that the Revised Note "merely provides that a defendant who goes to trial normally will have difficulty proving acceptance of responsibility, unless the defendant went to trial to challenge the constitutionality of a statute or to challenge whether the statute applied to his conduct." *United States v. Guadagno, supra,* 766 F.Supp. at 620. We agree that the defendant was not "punished" for exercising his right to trial. Rather, he chose not to plead guilty and therefore was not rewarded.

■ This guideline applies whether or not a defendant goes to trial. *United States v. Agrell,* 965 F.2d 222, 228 (7th Cir.1992);[10] *United States v. Martinez,*

---

**8.** *See United States v. Williams,* 940 F.2d 176, 183 (6th Cir.), *cert. den.,* —— U.S. ——, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991) ("[A] defendant who expresses regret for the results of criminal conduct without admitting criminal intent does not accept responsibility within the meaning of the Sentencing Guidelines.").

**9.** The Fourth Circuit observed in *United States v. Martinez,* 901 F.2d 374, 378 (4th Cir.1990), a case where the defendant's acknowledgment followed his jury trial and the filing of his presentence investigation report, that "finding the defendant's belated statement sufficient in itself to carry his burden of proof for the reduction would open the door to abuse of the spirit and

purpose of encouraging acceptance of personal responsibility for one's criminal conduct." *Accord United States v. Williams, supra,* 940 F.2d at 182 ("A letter sent prior to sentencing but after conviction does not reflect the type of timely acceptance of responsibility envisioned in the Sentencing Guidelines.") (*citing United States v. Martinez, supra,* 901 F.2d at 378).

**10.** In *Agrell,* the Court observed that revised Application Note 2 to Guideline § 3E1.1 provides that the acceptance of responsibility reduction *"is not intended to apply to a defendant [like Agrell] who puts the government to its burden of proof at trial by denying the essential factual elements of guilt,* is convicted, and only

901 F.2d 374, 378 (4th Cir.1990).[11] It merely continues the previous sentencing practice of rewarding those defendants who plead guilty rather than going to trial. *United States v. White, supra,* 875 F.2d at 431 ("Recognizing the utility of this past practice, the guidelines were promulgated to continue it, albeit in a restricted form."). As Judge Easterbrook observed in *United States v. Escobar–Mejia,* 915 F.2d at 1153, " '[a]cceptance of responsibility' is in most cases a thinly disguised reduction for pleading guilty, a lure the prosecutor and the court may dangle for saving them the time and risk of trial." Because Guadagno went to trial in order to challenge his factual guilt (rather than, for example, challenging the constitutionality of a statute), this case does not fit within the "rare circumstances" described in revised Application Note 2 and Guadagno was not entitled to an acceptance of responsibility credit. *See United States v. Agrell, supra,* 965 F.2d at 228.

### III. CONCLUSION

For the foregoing reasons, we affirm the defendant-appellant's conviction and sentence.

AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

I concur in the judgment and join all but Part II.B of the court's opinion. The parties' debate about the enhancement for "recklessness" is academic for two reasons. First, by the time of Guadagno's sentencing, that enhancement had been re-

scinded by amendment No. 330 and replaced by a base offense level of 20, producing the same outcome without regard to recklessness. Second, our opinion in *United States v. Golden,* 954 F.2d 1413, 1417 (7th Cir.1992), ordains the outcome of the controversy even if the old version of § 2K1.4 applied. *Golden* concluded that "[i]n this day and age, the arson of an urban structure—whether residential or commercial—is virtually a per se reckless endangerment of others." Guadagno's was an urban arson.

For reasons given in my separate opinion in *United States v. Foutris,* 966 F.2d 1158 (7th Cir.1992), also issued today, I question whether arson is so dangerous that it automatically displays reckless disregard of life. Those doubts do not undermine Guadagno's sentence, however. He used accelerants so plentiful and vigorous that their explosion blew out a wall, and the fire department deemed the site so hazardous that it withdrew all crews. Guadagno started this fire before the store's normal closing hours, indifferent to the risk that a customer would arrive just in time for the blast. So we could, and should, affirm without regard to the principle of *Golden.*

---

then admits guilt and admits guilt and expresses remorse." *Id.* (emphasis and bracketed material original).

**11.** Guadagno's attack on the district court's use of the revised Application Note, which was amended *after* he committed the charged offenses, is unavailing. This Court has consistently held that a sentencing court may consider a revised application note without offending due process or the *Ex Post Facto* Clause if the revised application note was intended to clarify the interpretation of a guideline rather than to alter substantive rights. *United States v. Edwards,* 945 F.2d 1387, 1391–1392 (7th Cir.1991), *cert. den. sub nom.* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). Revised Application Note 2 clearly falls within this description. *See United States v. Williams, supra,* 940 F.2d at 182, n. 4 (*citing United States v. Fiala,* 929 F.2d 285, 290 (7th Cir.1991)). Accordingly, the district court did not err in considering it in determining whether Guadagno was entitled to an acceptance of responsibility credit.