March 26, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1358

UNITED STATES
Appellee,

v.

GEORGE CHAPDELAINE,
Defendant, Appellant.

ERRATA SHEET

The opinion of this Court issued on March 25, 1993, is
amended as follows:

On page 5, line 8 of first full paragraph: replace " 1"
with " 2113(a)".

On page 5, line 10 of first full paragraph: insert "a"
between "transporting and "stolen" and delete the "s" in
"vehicles".

On page 7, line 3 of first full paragraph: capitalize the
"c" in "1st cir."

On page 8, line 3: replace "37" with "39".

March 25, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1358

UNITED STATES,

Appellee,

v.

GEORGE CHAPDELAINE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge]

Before

Selya, Cyr and Boudin, Circuit Judges.

Louis F. Robbio with whom Robbio & Nottie, Ltd. was on brief for

appellant.
Margaret E. Curran, Assistant United States Attorney, with whom

Lincoln C. Almond, United States Attorney, and James H. Leavey,

Assistant United States Attorney, were on brief for appellee.

March 25, 1993

BOUDIN, Circuit Judge. George Chapdelaine appeals

following his conviction for numerous offenses arising out of

the planned robbery of a Wells Fargo truck by himself and

others at the Emerald Square Mall in North Attleboro,

Massachusetts. The plan was frustrated when the truck left

the location earlier than usual. Chapdelaine was convicted

after trial while his accomplices pled. We affirm.

I. THE EVENTS

Acting on an informant's tip, federal agents and state

and local police on March 3, 1991, followed Chapdelaine and

Anthony Fiore to a meeting with Edward Mahan and George

Whalen in Walpole, Massachusetts.1 The next day, March 4,

Chapdelaine, Fiore, and Mahan drove Mahan's vehicle to a

parking lot in Canton, Massachusetts. When they left, Fiore

was driving a Wagoneer jeep later reported stolen from the

lot. The Wagoneer was taken to a garage in Walpole,

outfitted with a false registration plate, and then driven by

Fiore (accompanied by Chapdelaine in another car) to a

parking lot in North Providence, Rhode Island, where it was

left. Fiore later lodged a stolen Jaguar in a different

parking lot in Warwick, Rhode Island.

On March 25, Chapdelaine and Fiore arrived in separate

vehicles at the Emerald Square Mall in North Attleboro,

1Several law enforcement officers who participated in
surveillance of the four men testified at trial to the
group's activities.

-2-

Massachusetts. There, Fiore got into Chapdelaine's car and

the two drove around the mall before leaving. A few hours

later, the two men returned to the mall in Fiore's Plymouth,

this time accompanied by Mahan and Whalen. The Plymouth was

parked near a BayBank branch bank located in the mall, and

Fiore and Mahan watched a Wells Fargo truck as it arrived at

the bank and was loaded by a guard. The following day, March

26, Fiore returned alone to the mall, spent a short period of

time, and then left without having made any purchases.

The next day, March 27, Chapdelaine and Fiore drove to a

department store parking lot in Taunton, Massachusetts, where

they remained in their car as the same Wells Fargo truck

which served the Emerald Mall BayBank arrived to serve the

department store. When the truck crossed the street to a

nearby bank, Chapdelaine and Fiore moved their car to a spot

closer to the bank. After the truck left the bank, the two

men drove back to the Emerald Mall parking lot before going

home. They returned the following day, March 28, to the lot

in Taunton, where they again waited in their car until the

Wells Fargo truck arrived and departed.

The next morning, March 29, Chapdelaine and Fiore made

another brief visit to the Emerald Mall parking lot before

proceeding to a parking lot in Cumberland, Rhode Island, to

drop off the stolen Jaguar. They then picked up the stolen

Wagoneer, now in Fiore's garage and bearing yet another

-3-

registration plate, and drove it to the Cumberland lot.

Later all four men met at the Cumberland lot. There,

Chapdelaine opened the trunk of his car, put on gloves,

handed another pair of gloves to Whalen, and removed from the

trunk a green laundry bag which was then placed in the

Wagoneer. The group then drove the stolen vehicles and

Fiore's Plymouth to the Emerald Mall parking lot. As the men

entered the mall lot at 1:27 p.m., they were passed by the

Wells Fargo truck on its way out; the truck's normal arrival

time at the mall was 2 p.m. but this was Good Friday, and

several of the truck's usual stops were closed. The four men

pulled into a parking garage, remained there for a few

minutes, and then drove back to the staging area in

Cumberland.

In Cumberland, all four were arrested. The Wagoneer,

which Chapdelaine was then driving, had to be turned off with

a screwdriver because the steering column was pulled back and

there was no key in the ignition. A subsequent search of the

vehicles turned up the green laundry bag (now in Fiore's

Plymouth) which was found to contain firearms (including a

.357 Magnum with an obliterated serial number), ammunition, a

make-up kit, a black wig and a washcloth. Other items seized

from the vehicles included gloves, several pieces of

clothing, a make-up removal kit, and a police scanner and

radio guidebook. Later that day, in a search of

-4-

Chapdelaine's home in Woonsocket, Rhode Island, agents found

five .357-caliber bullets in his bedroom closet and $22,000

in cash under his bed.

All four men were indicted. Fiore and Mahan pled guilty

prior to trial.2 Whalen, tried together with Chapdelaine,

entered a guilty plea shortly before the close of the

government's case. Chapdelaine was convicted of conspiracy

under 18 U.S.C. 371 to rob a federally insured bank and to

commit four other, related offenses; of two Hobbs Act

violations, 18 U.S.C. 1951; of attempting to rob a

federally insured bank, 18 U.S.C. 2113(a); of using and

carrying firearms during a crime of violence, 18 U.S.C.

924(c)(1); of transporting a stolen vehicle in interstate

commerce, 18 U.S.C. 2312; and of four firearms-related

offenses, 18 U.S.C. 922. After trial, the district court

vacated the conviction on one of the firearms counts because

Chapdelaine's name had been inadvertently omitted from that

count in a superseding indictment used at trial. On all

counts but one, Chapdelaine was sentenced to concurrent

sentences, the longest being 78 months' imprisonment; on the

conviction for carrying a firearm during a crime of violence,

the court imposed the five-year consecutive prison sentence

made mandatory by 18 U.S.C. 924(c). This appeal followed.

2Fiore's appeal from his sentence has been previously
decided. United States v. Fiore, 983 F.2d 1 (1st Cir. 1992).

-5-

-6-

II. THE TRIAL

Publicity and Jury Prejudice. Chapdelaine first

contends that the district court erred in denying his

informal motion for a change of venue on grounds of

prejudicial pretrial publicity. As evidence of prejudicial

coverage, Chapdelaine points to articles in the Providence

Journal newspaper and to local television coverage, which he

says was inflammatory. Since Chapdelaine does not describe

the content of the television reports, nor allege that the

reports were seen by any of the jurors, we have no basis for

evaluating his complaint about televised coverage.

As for the newspaper articles, they are largely factual

accounts of the arrests of the four men and subsequent guilty

pleas of Fiore and Mahan.3 On the day trial began, the

district judge questioned each of the jurors and alternates,

who had been empaneled two months before, to determine

whether they had discussed the case, been approached or read

or heard anything about it. Only four of the panel, two of

whom ultimately deliberated, answered in the affirmative;

each had been exposed to a November 20, 1991 Providence

Journal article indicating that two of the defendants had

pleaded guilty before trial. All four of the panel members

3One of the articles mentions Chapdelaine's prior
conviction for cocaine trafficking and an informant's claim
that Chapdelaine and Fiore had earlier tried to rob another
armored car. There is no indication that any juror saw this
article or knew these supposed facts.

-7-

affirmed that they could be impartial. Neither Chapdelaine

nor Whalen challenged any of the four for cause.

There is no basis on this record for any claim of

"widespread, highly inflammatory publicity." United States

v. Moreno Morales, 815 F.2d 725, 734 (1st Cir.), cert.

denied, 484 U.S. 966 (1987). The only issue is whether juror

knowledge of guilty pleas by co-defendants is information so

searing that failure to excuse the juror for cause is plain

error, even though the trial judge found the jurors to be

impartial. The voir dire did not in this instance reflect a

"pattern of deep and bitter prejudice," Irwin v. Dowd, 366

U.S. 717, 726 (1961), compelling the court to override the

juror's claim of impartiality. We do not think juror bias is

inherent in the knowledge that a co-defendant has pled.

Hines v. United States, 131 F.2d 971, 974 (10th Cir. 1942).

Cf. Murphy v. Florida, 421 U.S. 794 (1975) (juror knowledge

of defendant's prior convictions).

There is even less basis for Chapdelaine's complaint

that some of the seated jurors had relatives in law

enforcement or were familiar with some of the trial

participants or their families. Chapdelaine was entitled to

challenge jurors for cause or to argue on appeal that it was

plain error not to excuse a juror. But here no specifics are

offered in his brief, so there is no error to assess. As for

the claim that trial counsel was ineffective in failing to

-8-

challenge jurors, that issue is not normally open on direct

appeal and must await a collateral attack, if Chapdelaine

chooses to make one. See United States v. Arango-Echeberry,

927 F.2d 35, 39 ((1st Cir. 1991).

Whalen's Guilty Plea. As the government was completing

the presentation of its case, Whalen pled guilty (outside the

presence of the jury) and withdrew from the trial. This

prompted a motion for mistrial from Chapdelaine, which the

district court denied. Chapdelaine's position then, renewed

now, was that the jury would conclude from Whalen's absence

that he had pled guilty and would draw the further inference

that Chapdelaine, as an alleged co-conspirator, must be

guilty as well.

We addressed this issue in United States v. Del Carmen

Ramirez, 823 F.2d 1 (1st Cir. 1987). The district court in

that case, faced with the same situation, declined to declare

a mistrial but gave a cautionary instruction to the jury. We

approved this approach, stating that the court should

"clearly and carefully instruct the jury to consider the

evidence against a particular individual, alone, and to

determine guilt or innocence on that basis." Id. at 3. In

this case, the district court delivered an instruction almost

identical to the one we approved in Del Carmen Ramirez:

Members of the Jury, you'll note that
Mr. Whalen is no longer sitting at
counsel table and he is no longer a party
to this action. You are not, I repeat,

-9-

you are not to speculate, surmise in any
way whatsoever why he is not here. It's
none of your concern; it's not part of
your deliberations; you will not even
discuss the matter as we go forward. The
case stands here with Mr. Chapdelaine as
the defendant. Is anyone going to have a
problem with that? If so, speak up now.
I can't stress to you the importance of
fairness, objectivity, total impartiality
and I stress that again and I stress to
you why he is not here is none of your
concern; it has nothing to do with your
deliberations in this case in any way
whatsoever.

Chapdelaine now says that the instruction should have

been repeated in the closing charge to the jury. At trial,

he made no such request and the failure to do so was not

plain error.

Sufficiency of the Evidence. Chapdelaine next claims

that the evidence at trial was insufficient to prove

conspiracy, attempted robbery, various firearms-related

offenses, and interstate transportation of a stolen vehicle.

In assessing these claims, reasonable inferences and

credibility judgments are taken in the light most favorable

to the verdict; and the issue is whether a rational jury

could have found the defendant guilty beyond a reasonable

doubt. United States v. Batista-Polanco, 927 F.2d 14, 17

(1st Cir. 1991).

Beginning with conspiracy, Chapdelaine says that the

evidence did not prove an intent to commit robbery. This is

not a serious argument. The evidence described at the outset

-10-

of this opinion, a sketch that omits further incriminating

detail, could easily persuade a reasonable jury that

Chapdelaine and his associates "cased" the BayBank branch and

the armored truck, positioned stolen vehicles for an escape,

acquired weapons and disguises, arrived at the scene ready to

commit the crime and were frustrated only by an accidental

change in the truck's schedule. United States v. Buffington,

815 F.2d 1292 (9th Cir. 1987), where the Ninth Circuit found

the evidence inadequate, involved far less aggravated facts.

This same evidence supported Chapdelaine's conviction

for attempted robbery. To prove attempt, the government must

establish both an intent to commit the substantive offense

and a "substantial step towards its commission," United

States v. Figueroa, 976 F.2d 1446, 1459 (1st Cir. 1992),

comprising "more than mere preparation" but "less than the

last act necessary before the actual commission of the

substantive crime." United States v. Manley, 632 F.2d 978,

987 (2d. Cir. 1980), cert. denied, 449 U.S. 1112 (1981).

Chapdelaine argues that the group's actions amounted to no

more than mere preparation because the defendants did not

leave their vehicles or make a move toward the bank. In Del

Carmen Ramirez we found that a group's conduct in "casing the

bank, stealing a car, and arriving armed at the bank shortly

before the Wells Fargo truck was to arrive" constituted a

substantial step toward robbery. 823 F.2d at 2. See also

-11-

United States v. Johnson, 962 F.2d 1308, 1310-11, 1312 (8th

Cir.) (same result under similar facts), cert. denied, 113

S.Ct. 358 (1992). That describes the activity in this case,

and we have no reason to reach a different result.4

Turning to the firearms-related offenses, Chapdelaine

was convicted of using firearms during and in relation to a

crime of violence, possession of firearms and ammunition

after a felony conviction, and interstate transportation of a

firearm with an obliterated serial number. In addition to

the guns and ammunition recovered from the green laundry bag,

police also seized five rounds of ammunition from

Chapdelaine's bedroom closet. The ammunition recovered from

the closet formed the basis of a separate count.

Chapdelaine's argument on appeal is two-fold. First, he

says that the evidence did not show that he "knowingly"

possessed the guns found in the laundry bag because there was

no proof that he looked inside the bag. At trial,

Chapdelaine testified that he thought the bag contained a

tire jack and car tools. Noting that the bag was recovered

from Fiore's Plymouth instead of the Wagoneer, Chapdelaine

4In a related argument, Chapdelaine contends that the
jury instruction on what is "a substantial step" was
inadequate. The objection was not raised at trial and we are
not told what was wrong with the instruction other than that
"a more complex and detailed instruction was required." We
therefore consider the claim waived. See United States v.

Zannino, 895 F.2d 1, 17 (1st Cir.) (issued raised in a

perfunctory manner are deemed waived), cert. denied, 494 U.S.

1082 (1990).

-12-

argues that the evidence did not exclude the possibility

that, unbeknownst to him, guns were substituted for the jack

and tools when the bag was transferred from the Wagoneer to

the Plymouth. In this case, involving a carefully planned

armed robbery with abundant weapons, we think the jury could

reasonably infer that the bag's contents when seized were the

same as when Chapdelaine handled the bag hours before, and

that Chapdelaine knew that the bag contained firearms. See

United States v. Arango-Echeberry, 927 F.2d at 38.

Second, Chapdelaine argues that the evidence failed to

prove his "possession" of the firearms in the laundry bag and

the ammunition found in his bedroom closet. Chapdelaine's

handling of the laundry bag adequately established his

possession of the weapons within.5 As for the bullets in

his closet, Chapdelaine emphasizes that the owners of the

house where he rented a room were gun dealers who testified

to storing ammunition throughout the home. However, the

bullets retrieved from Chapdelaine's closet were in an area

within his "dominion and control." Further, they matched

those found in the .357 Magnum recovered from the laundry

bag. This was enough to prove that Chapdelaine was at least

5As for the question of the guns' use in relation to the
crime, the jury could readily have concluded that, by
transferring the guns to the Wagoneer before setting off for
the mall with the others, Chapdelaine "intended to have [the
weapons] available for possible use during or immediately
following" a robbery. United States v. Payero, 888 F.2d 928,

929 (1st Cir. 1989).

-13-

in "constructive possession" of the ammunition in his closet.

See United States v. Garcia, Nos. 92-1427, 92-1428, slip op.

at 6-11 (1st Cir. Feb. 4, 1993); United States v. Wight, 968

F.2d 1393, 1397-98 (1st Cir. 1992).

Chapdelaine's last attack on the evidence requires

little comment. He says that a rational jury could not

convict him of knowingly transporting a stolen vehicle across

state lines because, as he testified at trial, he did not

realize the Wagoneer was stolen. But of course the jury was

entitled to disbelieve his testimony, and Chapdelaine does

not otherwise contest the government's proof. That proof

included (in addition to that summarized at the outset)

evidence that Chapdelaine possessed tools commonly used by

car thieves and Chapdelaine's own admission that he used a

screwdriver to start the Wagoneer.

The Flaw in the Indictment. Chapdelaine's next claim of

error is the most serious: he was mistakenly convicted of an

offense for which he was not indicted. The count at issue

charged interstate transportation of a stolen firearm, a Colt

.45 caliber pistol seized from the green laundry bag.

Chapdelaine was in fact initially named in this count in the

original indictment handed down by the grand jury. Probably

by accident, Chapdelaine's name was omitted from the count in

a superseding indictment.

-14-

The omission escaped the attention of the prosecutor,

Chapdelaine's defense counsel, and the trial judge, all of

whom proceeded as if Chapdelaine were still charged in the

count. At trial, Chapdelaine's counsel and the government

stipulated that the Colt was stolen, and there was evidence

that he knowingly transported it across state lines. The

district court charged the jury on the stolen firearm count

and it was included in a redacted indictment given to the

jury to reflect only counts naming Chapdelaine. In preparing

the pre-sentence report, the probation officer discovered the

error. The district court then vacated the conviction on the

stolen firearm charge but denied a motion by Chapdelaine for

a new trial on all counts.

We are not cited to any precedent directly addressing

this issue.6 The important fact conveyed to the jury,

Chapdelaine's possession of the weapon, was admissible as

"intent" evidence on several other counts, whether or not

possession was charged as an offense. The stipulated fact

that the gun was stolen may not have been admissible on the

other counts, but if so the prejudicial force of this point

was very faint, as other evidence showed multiple weapons,

6The closest in point is Chow Bing Kew v. United States,

248 F.2d 466 (9th Cir.), cert. denied, 355 U.S. 889 (1957).

The Ninth Circuit there dismissed a conviction on a count in
which the defendant was not named while leaving intact a
conviction on another charge. The question of whether the
former conviction invalidated the latter was apparently not
raised.

-15-

two stolen cars, an obliterated serial number and ample

planning. The jury was instructed to separate the evidence

as to each count, and its verdict--including the acquittal of

Chapdelaine on two counts relating to the stolen Jaguar--

suggests that it did just that.

III. SENTENCE

Chapdelaine's final challenge is to sentencing

calculations.7 First, as to the counts charging interstate

transportation of the stolen Wagoneer, he objects to

including the value of the stolen Jaguar and to a two-level

enhancement in his base offense level for more than minimal

planning. These computations were made in the pre-sentence

report, without objection by Chapdelaine. Whether or not

these computations were error (Chapdelaine was not convicted

of the counts relating to the stolen Jaguar), his sentence

was not affected by these two calculations. Pursuant to the

guidelines, the district court disregarded the stolen car

counts and set Chapdelaine's offense level solely on the

basis of the grouped robbery counts. U.S.S.G. 3D1.4(c).

It then sentenced Chapdelaine at the low end of the guideline

7Although the 1991 Sentencing Guidelines were in effect
at the time of Chapdelaine's sentencing, the district court
applied the 1990 guidelines in effect at the time of the
offenses, a result more favorable to Chapdelaine. See United

States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990).

All references in this opinion are to the 1990 guidelines.

-16-

range due to his age. Adjustments to the stolen car counts

simply did not figure into Chapdelaine's sentence.

Next, Chapdelaine complains of the computation on the

robbery counts. The guideline for robbery calls for a four-

level increase for losses ranging from $800,000 to

$1,500,000. U.S.S.G. 2B3.1(b)(6). Where as here an attempt

or conspiracy is at issue, "intended" loss is the test.8 At

sentencing, over Chapdelaine's objection, the court imposed a

four-level increase in his base offense level for a "loss" of

$1,000,000--the approximate amount of money contained in the

Wells Fargo truck when it stopped at the BayBank on the day

Chapdelaine and the others were arrested.

Chapdelaine contends that the loss in this case was

speculative because no robbery actually occurred. However,

"[i]n an attempted theft, the value of the items that the

defendant attempted to steal would be considered." U.S.S.G.

2X1.1, application note 2. The requirement in section

2X1.1(a) of "reasonable certainty" "goes to what with

reasonable certainty can be determined to be the

8U.S.S.G. 2B3.1, application note 3, cross-references
section 2B1.1 for "valuation of loss" in robbery offenses.
Section 2B1.1, application note 2, refers the judge to
section 2X1.1 in cases of "partially completed conduct."
Section 2X1.1 sets the base offense level as that fixed for
the object offense (in this case, robbery), "plus any
adjustments from such guideline for any intended offense
conduct that can be established with reasonable certainty."
U.S.S.G 2X1.1(a).

-17-

conspirator's intent." United States v. Medeiros, 897 F.2d

13, 18 (1st Cir. 1990).

Finally, Chapdelaine invokes section 2X1.1(b), which

directs the sentencing court to decrease by three levels the

offense level for an attempt or conspiracy unless the

defendant or conspirators were "about to complete" the

underlying offense "but for the apprehension or interruption

by some similar event beyond [the defendant's or

conspirators'] control." U.S.S.G. 2X1.1(b)(1), (2). The

district court in this case declined to grant the reduction

because it found that the robbery was frustrated "simply

because the . . . truck arrived earlier than usual." On

appeal, Chapdelaine disputes the correctness of this finding

while the government naturally urges us to uphold the

district court.

We affirm the district court's conclusion that on the

present facts Chapdelaine was not entitled to the reduction.

The evidence showed that Chapdelaine and the others arrived

at the mall prepared and equipped to carry out a robbery and

were thwarted only by the unexpected early departure of the

Wells Fargo truck. Under these circumstances, there was no

clear error in the district court's conclusion that

Chapdelaine was "about to complete" a robbery "but for

apprehension or interruption by some similar event beyond

the defendant's control." U.S.S.G. 2X1.1(b)(1). See

-18-

United States v. Johnson, 962 F.2d at 1313-14 (upholding

denial of the reduction under similar facts).

Chapdelaine argues that the reference in section

2X1.1(b) to an interruption "similar" to apprehension

excludes offenses that are prevented by fortuitous events

like the premature departure of the Wells Fargo truck. In

our view, the guideline reflects a policy decision that

conspiracies and attempts should be treated like substantive

offenses for sentencing purposes if the substantive offense

was nearly completed, and the defendant did not voluntarily

withdraw. The Sentencing Commission likely believed that

near accomplishment of the criminal object normally poses

enough risk of actual harm, and reveals enough culpability,

as to justify the same punishment that would be imposed for a

completed offense. It is nearness of the crime to

achievement--not the precise nature of the involuntary

interruption--that defeats the reduction available for

conspiracies and attempts that have not progressed very far.

This one progressed far enough.

The judgment of conviction and sentence are affirmed.

-19-