89 F.3d 824
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
John GRELLE, JR., Defendant--Appellant.
 No. 95-1947.
 United States Court of Appeals,
First Circuit.
 June 25, 1996.
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Mary M. Lisi, U.S. District Judge]
 Edward J. Romano for appellant.
 Margaret E. Curran, Assistant United States Attorney, with whom Sheldon Whitehouse, United States Attorney, and Kenneth P. Madden, Assistant United States Attorney, were on brief for appellee.
 Before LYNCH, Circuit Judge, COFFIN, Senior Circuit Judge, and CUMMINGS,* Circuit Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 In August 1994 John Grelle and Robert Joost were indicted for conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. The 12-day trial commenced in March 1995. The jury returned a guilty verdict against Joost, but was unable to reach a verdict as to Grelle. In May 1995 a new jury was impaneled to retry Grelle. In June, he pled guilty to the single count indictment and was sentenced to 46 months in prison plus supervised release of three years. Grelle appeals three offense characteristic enhancements imposed by the district court pursuant to the Sentencing Guidelines. We now affirm.
 
 I.
 
 2
 The following summary of the facts is drawn from the presentence report, the first trial record, and transcripts of tapes of recorded conversations admitted at the trial. In March 1994, Detectives Steven O'Donnell and Joseph DelPrete of the Rhode Island State Police conducted an undercover investigation of the manufacture of counterfeit Foxwoods Casino, Connecticut, slot machine tokens by Joost. The detectives met Joost on March 23, 1994. Approximately a month later, after several meetings with Joost and various deliveries of counterfeit tokens, Joost asked the detectives if they would commit an armored car robbery with him. The detectives learned that the plan was to rob an armored car belonging to Meehan Armored, Inc. Among other items, the car carried a gold cargo that it picked up late afternoons from Leach and Garner, an Attleboro, Massachusetts, precious metals manufacturer. The armored car and the gold were then stored overnight at the Meehan headquarters in Woonsocket, Rhode Island. At 3:00 a.m. two Meehan guards would load the gold into the armored car at Woonsocket and drive the cargo to New York City. Joost planned to rob the armored car as it left the Woonsocket building while the guards were busy securing the premises. At the meeting, Joost detailed how he, the detectives, and a fourth person would conduct the robbery; he indicated that he needed four guys for the operation and that he already had one "guy."
 
 
 3
 The same three met again several times in May 1994 during which Joost told the detectives further details about the proposed robbery. On May 28 he introduced them to defendant Grelle. The four traveled to Pennsylvania to rob a trailer and warehouse, but a prearranged stop by the police brought an end to the plan. During the trip, however, Grelle told the two detectives that he was going to participate in the armored car robbery along with them and Joost. Grelle also stated that he was the manufacturer of the counterfeit Foxwoods Casino tokens.
 
 
 4
 On June 16, Joost told the detectives that he had looked at the Meehan building around midnight but left when he saw a police officer driving up the access road. He said that five people would be the right number to commit the robbery and gave them other details. On June 27, Joost told the detectives that he and they would arrive at the Meehan building the next midnight in order to survey the premises. Joost said that Grelle would drop them off and pick them up at 4:30 in the morning. The trip was then postponed to the following evening. The detectives met Joost on the evening of June 29 and he said that he had explained the robbery plans to Grelle. At 11:00 p.m. the three men met Grelle in Smithfield, Rhode Island. One detective and Joost drove with Grelle in his car while the other detective followed in his own car. During the drive, Joost complained about Grelle's choice of a car, and Grelle promised a better car for the robbery itself.
 
 
 5
 The two cars met up at a housing complex in Cumberland. When Detective DelPrete asked Grelle how he knew about the complex, Grelle responded, "When you plan, you plan well." All four then proceeded to Woonsocket in Grelle's car. Joost and the two detectives left Grelle in order to survey the Meehan building while Grelle agreed to pick them up later. The details of the planned robbery were then explained by Joost to the two detectives. Joost explained how one guard would be handcuffed in the truck and his mouth taped, and how they would put a gun to the guard's head and shoot if necessary. Since the guards had not appeared as expected at 4:00 a.m., Joost and the detectives returned to the pickup point where Grelle met them. Joost told Grelle that they had missed the armored car.
 
 
 6
 On July 21, Joost again described the armored car robbery plan to the detectives and again mentioned putting a gun to the head of one of the Meehan guards. On August 5, Joost and Grelle were arrested by federal agents and Rhode Island police detectives and Grelle's office was searched by federal agents, who seized a mold for counterfeiting U.S. quarters. They also seized from his car molds for counterfeit one- and five-dollar Foxwoods Casino tokens and two counterfeit one-dollar Foxwoods Casino tokens. From Grelle's home in North Scituate, Rhode Island, the agents seized 15 counterfeit U.S. quarters, some marijuana plants, a bag of marijuana, and still other counterfeit casino tokens.
 
 
 7
 At the joint trial, the director of security for two manufacturing companies testified that those companies manufactured items in gold and silver in the Attleboro, Massachusetts, area and shipped the finished products five days weekly to New York City via the Meehan Woonsocket company, which delivered the products to various customers in New York. He indicated that the dollar value of the average daily shipments from April 1994 to August 1994 ranged from $455,887 to $848,998. A Meehan official testified that other precious metal shipments accompanying that cargo averaged about $5,000,000 daily.
 
 
 8
 Subsequently Grelle prepared a statement for inclusion in the presentence report in support of an adjustment for acceptance of responsibility. He admitted that he had been involved in the robbery and counterfeit tokens conspiracies and added "I knowingly involved myself, and in doing that I committed a crime." In return for Grelle's guilty plea, the government agreed to recommend the lowest term in the applicable Guidelines range and that it run concurrently to any other sentence. The government agreed that Grelle did not participate in the conversations between Joost and the detectives in which (1) the amount of gold, (2) the use of firearms, (3) the possible shooting or killing of the Meehan guards, or (4) the restraint of those guards were discussed. However, the government specifically reserved its right to argue that these details were reasonably foreseeable to Grelle.
 
 
 9
 In the plea agreement the government agreed to recommend that Grelle receive a two-level decrease for acceptance of responsibility provided that (1) he admit his involvement in the criminal conduct, (2) he otherwise complied with all the requirements of U.S.S.G. § 3E1.1, and (3) he did not receive an enhancement for obstruction pursuant to U.S.S.G. § 3C1.1. The government also agreed to recommend that he receive a three-level decrease under U.S.S.G. § 2X1.1(b)(2) because the substantive crime was not close to commission and that he receive a four-level decrease for a minimal role under U.S.S.G. § 3B1.2(a).
 
 
 10
 The district court determined the base offense level to be 20. It then imposed a 6-level increase for intended use of a firearm, a 2-level increase for intended restraint of a victim, and a 3-level increase for an intended loss between $250,000 and $800,000. The court then subtracted 3 levels for insubstantial completion of the substantive defense, 4 levels for minimal role, and 2 levels for acceptance of responsibility. The total offense level was 22 with a sentencing range of 41 to 51 months' imprisonment. The court imposed a sentence of 46 months in prison and 3 years of supervised release.
 
 II.
 
 11
 Grelle claims that the three sentence enhancements were erroneous on the ground that the evidence was inadequate to show that he had knowledge of the intended conduct or the amount of the intended loss. However, we conclude that the circumstantial evidence is more than adequate to establish that the use of firearms, the restraint of armored car guards and the intended loss of a gold cargo were not only reasonably foreseeable to defendant but that he knew the plan involved those factors and that his agreement to participate covered such conduct.
 
 
 12
 As noted, defendant pled guilty to a conspiracy to commit robbery. The guideline applicable to conspiracies, U.S.S.G. § 2X1.1, tells the trial court to use the base offense level for the substantive offense plus appropriate adjustments. Here the substantive offense was robbery, and the robbery guideline sets the base offense level at 20 and includes as specific offense characteristics the use of a firearm, U.S.S.G. § 2B3.1(b)(2)(B); physical restraint of a person to facilitate commission of the offense or escape, U.S.S.G. § 2B3.1(b)(4)(B); and the amount of loss, U.S.S.G. § 2B3.1(b)(6). In determining the applicability of these specific offense characteristics, the Guidelines direct the court to consider not only the defendant's actual conduct and the conduct he agreed to undertake, but also "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B). The Commentary explains that a defendant is accountable for the conduct of others in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity. See U.S.S.G. § 1B1.3, comment.
 
 
 13
 The Commentary states that the relevant conduct determination for a particular defendant depends on the scope of the activity he agreed to undertake jointly. To determine the scope of a defendant's agreement, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." Id. The Commentary admonishes that "the criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical." Id. For example, the note describes a defendant who agrees with another to commit a robbery and explains that even though the defendant did not contemplate an assault, he would be accountable for an accomplice's assault of the victim in the course of the robbery "because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense)." Id.
 
 
 14
 The Guidelines thus contemplate that a defendant would be accountable for sentencing purposes for his own intended conduct within the scope of the conspiracy, but also accountable for the intended scope of his co-conspirator that was in furtherance of the conspiracy and was reasonably foreseeable to the defendant. The reasonable certainty requirement of U.S.S.G. § 2X1.1(a) contemplates that in considering specific enhancements, the sentencing court will consider "what with reasonable certainty can be determined to be the conspirator's intent." United States v. Madeiros, 897 F.2d 13, 19 (1st Cir.1990). Finally, the conspiracy guideline considers that a defendant may be held accountable for acts that have not yet been performed. See United States v. Chapdelaine, 989 F.2d 28, 35 (1st Cir.1993), cert. denied, --- U.S.----, 114 S.Ct. 696 (1994).
 
 
 15
 We now proceed to Grelle's specific objections regarding the three enhancements imposed by the district court. A court's factual determinations supporting a sentence must be proved by the government by a preponderance of the evidence, and this Court reviews such findings only for clear error. United States v. Legarda, 17 F.3d 496, 499 (1st Cir.1994).
 
 A.
 
 16
 The conspiracy and robbery guidelines provide for a 6-level enhancement for intended use of a firearm. U.S.S.G. § 2B3.1(b)(2)(B). District Judge Lisi presided over the first trial and was therefore familiar with the details of the case, so that her rulings are entitled to great deference. 18 U.S.C. § 3742(e). She found here that the use of firearms was foreseeable to this defendant because Grelle acknowledged that he had knowingly become involved in an "armed robbery conspiracy" and admitted that Joost, his co-defendant in the original trial, told him about the robbery and had taken Grelle to the robbery site on the previous day. Indeed, as early as May 28, 1994, defendant had become a co-conspirator by planning to participate in the armored car robbery with Joost and the detectives.
 
 
 17
 Grelle was present during many of Joost's conversations with the detectives, though it is not established that he was present when Joost specifically mentioned firearms. Joost nevertheless mentioned to the detectives that guns would be needed to subdue the guards and that it might be necessary to put guns to their heads and shoot them. Under the plans known to Grelle, he would certainly realize that the armored car guards would be carrying firearms and would have to be subdued in order to steal the gold, thus requiring firearm use. Joost's plan to use firearms was reasonably foreseeable to Grelle and was proved by a preponderance of the evidence, so that the 6-level enhancement was properly assessed.
 
 B.
 
 18
 Under the robbery guideline, a 2-level enhancement is to be imposed if "any person was physically restrained to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.1(b)(4)(B). Under the conspiracy guideline, defendant was subject to such enhancement since the record shows that he knew or could reasonably foresee that one of the robbers intended to restrain another person in the commission of the robbery or the escape afterwards. Here the district court found that Grelle's participation in the conspiracy contemplated that the robbery would take place at the Meehan facility when guards would be present. As a result, the court properly concluded that it was reasonably certain that Grelle knew that a person would have to be restrained in order to successfully conclude the robbery. In addition, Joost had discussed detailed plans with the detectives involving the restraint of a Meehan guard. Based on Joost's willingness to discuss the plan's details with two of the participants, the district court found that he likely discussed the same plans with Grelle. The district court's finding that Grelle knew or could reasonably have foreseen that the plan involved the restraint of others was supported by a preponderance of the evidence and was not clearly erroneous.
 
 C.
 
 19
 Finally, the 3-level enhancement under U.S.S.G. § 2B3.1(b)(6)(D) was for an intended loss of between $250,000 and $800,000. Grelle was not held accountable for the entire $5,000,000 value of the cargo--the value testified to at trial--because the district judge found that he was not aware that the armored car contained precious cargo other than the gold. Rather, the district court based its determination on the trial testimony which showed that from April through August 1994, about a month before the intended robbery, the armored vehicle carried between $455,887 and $848,998 worth of gold on each run.
 
 
 20
 Grelle attacks the determination on the basis that the figures were not certain. However, the Commentary to the guideline states that the "loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2B1.1, comment. It is clear that Grelle intended to participate in the armored car robbery and that both Grelle and Joost knew or could reasonably foresee that the vehicle contained a large amount of money. At one point, Joost told the detectives that he thought the car could contain as much as several million dollars. Based on this information, the district court acted reasonably in imposing a 3-level increase for the intended loss. The decision was not clearly erroneous.
 
 III.
 
 21
 For the foregoing reasons, the sentence imposed by the district court is AFFIRMED.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation