**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Nicholas GIO and Joseph Marchiafava,**
**Defendants–Appellants.**

Nos. 92–1689, 92–1690.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1993.

Decided Oct. 13, 1993.

Barry R. Elden, Asst. U.S. Atty., Pamela Pepper, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S. in No. 92–1689.

Sharon G. Kramer (argued), Chicago, IL, for Nicholas Gio in No. 92–1689.

James P. Fleissner, Barry R. Elden, Asst. U.S. Attys., Pamela Pepper (argued), Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S. in No. 92–1690.

Raymond D. Pijon (argued), Chicago, IL, for Joseph Marchiafava in No. 92–1690.

Before CUMMINGS and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

A jury convicted defendants Joseph Marchiafava and Nicholas Gio of one count of conspiracy to commit arson in violation of 18 U.S.C. § 371, and three counts of traveling in interstate commerce to promote or carry on unlawful activity in violation of 18 U.S.C. § 152. Both defendants were sentenced to sixty-three months imprisonment and three years probation following completion of their sentences. The court also ordered Marchiafava and Gio each to pay $65,509.92 in restitution to Capital Indemnity Insurance Corporation, the insurer of the torched building, and each pay a $200.00 special assessment. The defendants appeal their convictions and sentences. We vacate the order of restitution entered against Gio and remand, but in all other respects affirm the defendants' convictions and sentences.

## I. BACKGROUND

### A. Facts

Defendant Marchiafava, Gio, Thomas De Roy, and Leo Kelly's indictment and convictions arose as a result of their conspiratorial acts in torching a bar named "The Country Pub" (hereinafter "the bar") located in Walworth County, Wisconsin. In 1985, Wisconsin businessman De Roy sold the bar to Kelly for $120,000. Kelly borrowed $42,000 from a local bank to finance the deal and was obliged to pay the remainder of the sale price directly to De Roy pursuant to their written contract. A subordination agreement with the bank provided that De Roy was responsible for making Kelly's mortgage payments in the event Kelly defaulted on the loan. Shortly after the deal closed, Kelly defaulted on the mortgage loan and was also unable to make his payments to De Roy.

De Roy had been acquainted with Marchiafava for approximately four years. During the four years of De Roy's acquaintance with Marchiafava, he had placed bets with Marchiafava and also had loaned Marchiafava approximately $100,000. Marchiafava borrowed the money to pay off his own substantial gambling debts with some of the upper-echelon bookmakers in Chicago. Marchiafava also owed approximately $80,000 in

gambling debts to a Chicago bookmaker named James Bollman, who had sent a minion named James LaValley to demand payment from Marchiafava in early 1988.

In November of 1987, Marchiafava attempted to borrow more money from De Roy in addition to the amount already owed to forestall the aggressive debt collection efforts of his Chicago creditors. Beset by his own dire financial straits created by Kelly's default and Marchiafava's failure to repay earlier loans, De Roy responded that he had no money to lend. Marchiafava then suggested that setting fire to the bar might be the solution to their financial woes. Marchiafava proposed that in exchange for the $42,000 loan, he would use his Chicago connections to locate an arsonist. Because the insurance money would be paid out in Kelly's name, De Roy met with Kelly to bring him into the scheme.

After meeting with De Roy and Marchiafava, Kelly reluctantly agreed to participate. Marchiafava subsequently contacted Bollman, and requested his assistance in locating an arsonist. In December 1987, Marchiafava, De Roy, and Kelly traveled to Chicago to meet with Bollman. Once in Chicago, Kelly went to a restaurant while Marchiafava and De Roy went to a club and met with Bollman. Marchiafava handed Bollman an envelope filled with cash, and reminded Bollman to set up the meeting with the arsonist. After the meeting, De Roy increased the insurance on the bar from $120,000 to $140,000.

Bollman thereafter provided Marchiafava with the phone number of an arsonist. Marchiafava arranged a strategy meeting for the arson with De Roy and the arsonist, Gio, at a bar in Lake Geneva, Wisconsin. De Roy came to the meeting with only $3,000 of the $12,000 arsonist performance fee. Marchiafava offered to contribute $6,000 towards the arsonist's fee if De Roy came up with the remainder. Gio stated that he refused to set the fire until he received the $12,000 in cash. The conspirators held from five to ten meetings and conversations before all the details of the arson were worked out.

LaValley, Bollman's debt collector, was also a friend of Gio. LaValley testified at trial that he had indoctrinated the younger

Gio in the customs of the underworld. When LaValley learned that Gio had been hired by Marchiafava to torch a bar, he wanted a piece of the action. After gaining permission from the Chicago mobsters to take part in the arson, LaValley agreed to share his expertise in such matters for $20,000. After reconnoitering the proposed arson target and receiving a $10,000 advance payment, LaValley obtained a phosphorous grenade from his immediate superior, Mario Rainone. On February 21, 1988, Gio and LaValley burned down the Country Pub with the grenade after LaValley checked the premises to see that the bar was empty. LaValley and Gio subsequently obtained an additional $5,000 from Marchiafava, and established a payment plan for the remainder of their fee.

The fire department investigation revealed that the cause of the fire was arson. Based on the fire department's investigation indicating arson the bar's insurer refused to pay under the policy, and led to an investigation by the Federal Bureau of Investigation ("FBI"). The Bureau contacted De Roy and he agreed to cooperate with the FBI and on February 6, 1991, he tape-recorded a telephone call to Marchiafava from the United States Attorney's office. During the conversation, Marchiafava implicated both himself and Gio in the arson. On the following day, De Roy engaged Marchiafava in another tape-recorded conversation again dealing with the Lake Geneva arson (hereinafter both conversations referred to as "De Roy–Marchiafava conversations"). Subsequently the FBI contacted Marchiafava and asked him to come to Chicago for an interview. During his March 18, 1991, meeting in Chicago with FBI agents, Marchiafava gave a statement (hereinafter "Marchiafava confession") inculpating himself, Kelly, De Roy, Bollman, and Gio.

Due to the insurance company's refusal to pay it became impossible for Marchiafava to pay his gambling debts to Bollman. Several months after the fire, Bollman used violence and the threat of dismemberment to increase the pressure on Marchiafava to pay his gambling debts. Marchiafava's wife testified that LaValley, Bollman's debt collector, called Marchiafava's home several times to remind Marchiafava of his debt obligations. When LaValley was unable to contact Marchiafava, he made threatening phone calls to Marchiafava's wife after identifying himself as "Jim Jr." LaValley allegedly threatened Mrs. Marchiafava that her husband, who had only one arm, would lose his other arm "or worse" if the debts were not promptly paid. During his testimony at trial, LaValley denied that he ever threatened Mrs. Marchiafava.

LaValley had been an enforcer for Bollman since 1989. Prior to his employment with Bollman, LaValley had been a member of an organized crime "street crew" engaged in extortion and juice loan debt collections. LaValley had a varied apprenticehood for his life of crime: by age 27 he had participated in more than fifty burglaries, had been a golf hustler, and had even had a brief stint as an electrical contractor. LaValley testified that he abandoned his pursuit of a legitimate livelihood when he was given the opportunity to earn money by threatening unsuccessful bettors with broken limbs, stabbing, beheading, and other forms of death and mayhem. LaValley also testified that aside from the violence and threats of violence directed at juice loan debtors, he had the duty of calling up legitimate businessmen and threatening to kill them or their families if they did not contribute large sums of protection money. LaValley boasted and made clear that there were only three ways to avoid him: to shoot him, to run away, or to contact the police. LaValley testified that he took precautions against the first eventuality, and his anger mounted if his victims chose either of the remaining options.

Carol Marchiafava, Marchiafava's wife, and his daughter, Debora Ann Harris, both testified that two men came to Marchiafava's house on April 22, 1988, several months after the arson. Carol Marchiafava later identified the visitors as Bollman and LaValley. The two men grabbed Marchiafava, took him into a bedroom, and ordered Marchiafava's wife and daughter out of the room. One of the men prevented Carol Marchiafava from following through on her threat to telephone the FBI. Harris followed her mother's advice and exited the home.

Approximately half an hour later, Bollman and LaValley departed. Harris returned to the house and discovered that as a result of the beating, her father had blood running from his mouth and nose, and that his face was marked by a handprint. LaValley testified that he had slapped Marchiafava on the head several times and warned him to come up with the money owed within a week. Five or six days later, Marchiafava and his wife left the state and went undercover and traveled around the country for eight months in an attempt to elude LaValley. Eventually they returned to Illinois and rented an apartment in Rockford under a pseudonym.

### B. Proceedings Before the District Court

Prior to the commencement of the December 1, 1991, trial, Marchiafava's counsel orally advised the court that he planned to present a coercion defense. Marchiafava's counsel stated that Marchiafava's fear of LaValley, Bollman's debt collector, effectively coerced him into committing the arson. At the conclusion of the trial the district court instructed the jury on Marchiafava's coercion defense.[1]

On the day of trial Gio filed a written motion requesting a severance. Gio argued that the reception of the prosecution's tapes of the De Roy–Marchiafava conversations in evidence would prejudice his defense. Gio asserted that admission of the inculpatory tapes would violate his constitutional right to confront his accusers, thus he was entitled to a severance. The district court rejected Gio's argument, basing its decision on Fed. R.Evid. 804(b)(3) and its analysis of Gio's rights under the Confrontation Clause. Both unredacted tapes were played at trial.

At trial, the government moved the court to receive in evidence Marchiafava's confession of March 18, 1991, that implicated both Marchiafava and Gio. Gio cited the Marchiafava confession as an additional basis for severance. At trial, Gio also objected to the

Marchiafava confession on the ground that it was outside the scope of the conspiracy. The government had redacted the confession to eliminate references to Gio's name. In response to Gio's objection, the district court agreed to instruct the jury that the redacted confession was to be admitted only as against Marchiafava. Gio further objected to admission of the confession, claiming that the redaction allowed the jury to infer he was involved in the conspiracy and therefore was not sufficient under *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

During trial, Marchiafava also objected to the admission of the redacted version of his FBI confession, arguing that he would be prejudiced by the admission of it because the substituted phrases might lead the jury to believe that Marchiafava's confession was less than complete or that he was withholding information. After reading a limiting instruction to the jury the court directed the jury to consider the confession only as against Marchiafava, and allowed the redacted confession in evidence.

At sentencing, the trial judge found that each defendant had an adjusted offense level under the Sentencing Guidelines ("U.S.S.G." or "Guidelines") of 20, based on each defendant's base offense level of 6 for arson and a fourteen-point enhancement for reckless endangerment under Guidelines § 2K1.4(b)(2). The trial court declined Marchiafava's request for a downward departure pursuant to Guidelines § 5K2.12 for his coercion defense and ordered that the defendants each pay $65,509.92 in restitution.

### II. ANALYSIS

The defendants appeal from the district court's evidentiary rulings and denial of their severance motions, as well as from the court's application of the United States Sentencing Guidelines in arriving at their sen-

---

1. The court's coercion instruction provided as follows:

 One of the issues in this case is whether defendant Joseph Marchiafava was coerced. A defendant who has been coerced must be found not guilty.

 If the defendant Joseph Marchiafava committed the offense charged only because he reasonably feared that immediate, serious bodily harm or death would be inflicted upon him (or others) if he did not commit the offense, and he had no reasonable opportunity to avoid the injury, then he was coerced.

tences. Specifically, Gio argues that the district court (1) violated his Sixth Amendment right of confrontation and Fifth Amendment due process right by accepting in evidence Marchiafava's redacted confession; (2) erred in ruling that Marchiafava's two tape-recorded statements with De Roy, which implicated Gio, were admissible as to Gio under Fed. R.Evid. 804(b)(3); (3) clearly erred in applying the fourteen-point enhancement under U.S.S.G. § 2K1.4(b)(2) for reckless endangerment; and (4) abused its discretion in imposing restitution as part of his sentence.

Marchiafava alleges that the district court erred in (1) rejecting his severance motion premised on his argument that the introduction of the redacted version of his confession would prejudice his coercion defense; (2) applying the fourteen-point enhancement under U.S.S.G. § 2K1.4(b)(2) for reckless endangerment; and (3) refusing to depart downward for the coercion defense pursuant to U.S.S.G. § 5K2.12.

### A. Marchiafava's Severance Motion

Prior to trial, Marchiafava notified the government and the district court that he would present a coercion defense, contending that he had participated in the arson only because of his fear of LaValley. During trial, Marchiafava objected to the admission of the redacted version of his FBI confession.

Marchiafava argued that he would be prejudiced by the redactions because substitution of the words "another person" or "the other person" in place of codefendant Gio's name in his confession might lead the jury to believe that Marchiafava was withholding information when he confessed to the FBI. While Marchiafava's pretrial severance motion did not allege as a basis for severance that the redacted confession would undermine his coercion defense,[2] he did raise the severance argument on the sixth day of trial. Our initial inquiry therefore is whether this delay in raising the severance issue amounts to a waiver of the issue.

■ Under Rule 12(b)(5) of the Federal Rules of Criminal Procedure, a defendant is obligated to move for a severance before trial. Failure to make a pretrial severance motion results in waiver, unless a relief from waiver is warranted for cause shown. Fed. R.Crim.P. 12(f).[3] Marchiafava neglected to file a pretrial motion alleging that the government's intention to introduce Marchiafava's redacted confession in evidence required severance. Marchiafava has failed to demonstrate cause for his failure to raise the severance motion prior to trial. Approximately one month before trial, the government filed its *Santiago* proffer, which stated that the government intended to read Marchiafava's confession into evidence.[4] The government

---

**2.** Marchiafava's pretrial severance motion was prompted by the government's intention to use statements made by Gio inculpating Marchiafava, and Marchiafava's contention that a joint trial would preclude him from calling Gio as a witness. The district court denied Marchiafava's severance motion, finding that a redaction of Gio's statement combined with a limiting instruction to the jury would cure any *Bruton* problems. The court also noted that Marchiafava had failed to provide the court with any indication that Gio would in fact testify on Marchiafava's behalf or whether such testimony would be exculpatory, thereby precluding severance warranted by a codefendant's favorable testimony. *See United States v. Tolliver*, 937 F.2d 1183, 1188–89 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 329, 116 L.Ed.2d 269 (1991).

**3.** Fed.R.Crim.P. 12(b)(5) requires that "[r]equests for a severance of charges or defendants under Rule 14" must be raised "prior to trial." Fed.R.Crim.P. 12(f) provides as follows:

Failure by a party to raise defenses or objections or to make requests which must be made

prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

**4.** Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure provides, in pertinent part:

Upon request of a defendant the government shall disclose to the defendant and make available for inspection, copying, or photocopying: any relevant written or recorded statements made by the defendant.... The government shall also disclose to the defendant the substance of any other relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known by the defendant to be a government agent if the government intends to use that statement at trial.

The defendant has not indicated, nor does the record on appeal suggest, that Marchiafava requested a copy of his statement. Presumably, the government provided the statement to the defendant on its own volition or pursuant to the

stated that "that statement will not be admissible against co-defendant Gio and all references to Gio will be redacted from the statement." R. 62, at 6. Marchiafava therefore knew that he was being tried with his codefendant Gio, that the government would use his confession as evidence, and that all references to Gio in Marchiafava's inculpatory statements would be redacted to protect Gio's rights under the Confrontation Clause. In some cases, a defendant's waiver may be excusable, as when he first learns of the availability of a coercion defense on the eve/at/during trial. *See United States v. Munoz,* 894 F.2d 292, 295 (8th Cir.) (no waiver under Rule 12(f) when defendant's counsel first learned of coercion defense after trial had begun), *cert. denied,* 495 U.S. 909, 110 S.Ct. 1934, 109 L.Ed.2d 297 (1990). This, however, is not such a case. Marchiafava had more than sufficient notice that a coercion defense was available to him. Prior to trial, Marchiafava notified the district court and the government that he planned to raise a coercion defense, but he did not file a pretrial severance motion on this ground. Because Marchiafava failed to show cause for his failure to file a pretrial severance motion based on his coercion defense, Fed.R.Crim.P. 12(f) does not provide Marchiafava with relief from waiver due to the untimeliness of his severance motion.

■ Despite Marchiafava's waiver under Rule 12(f), a "trial court has a continuing duty to grant [a] severance ... if it appears during trial that the failure to grant severance will result in undue prejudice to one of the defendants." *United States v. Harris,* 761 F.2d 394, 400 (7th Cir.1985); *see also Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960); *Munoz,* 894 F.2d at 294. The advisability of a

severance based on undue prejudice, however, "depends on a careful evaluation of facts elicited, prejudicial tendencies, and the entire course of the trial prior to the challenged conduct." *United States v. Goudy,* 792 F.2d 664, 673 (7th Cir.1986) (quoting *United States v. Banks,* 687 F.2d 967, 973 (7th Cir.), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1208, 75 L.Ed.2d 448 (1982)). Nonetheless, "Rule 14[5] does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). When defendants have been properly joined for trial, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* The trial judge is in the best position to assess any prejudice from the conduct of a defense, and we will reverse the judge's ruling on a severance motion only upon a showing of a clear abuse of discretion. *Goudy,* 792 F.2d at 673. Where a defendant has waived the severance issue by neglecting to file a pretrial motion and failing to show cause for his oversight, we review for plain error. *United States v. Wilson,* 962 F.2d 621, 625–26 (7th Cir.1992); *United States v. Taglia,* 922 F.2d 413, 416–17 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991); *United States v. Percival,* 756 F.2d 600, 611 (7th Cir.1985).

■ Marchiafava failed to demonstrate prejudice to the trial court. The defendant has similarly neglected to convince this court that the redacted version of his confession was more prejudicial than the unredacted version.[6] Marchiafava maintained that his

---

defendant's informal request. In all events, Marchiafava has not alleged that the government failed to fulfill its obligations under Rule 16.

**5.** Rule 14 provides, in pertinent part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.

**6.** Marchiafava's defense counsel actually requested that the court admit Marchiafava's confession in its unredacted form. Counsel stated:

So in all due respect, I must ask that the Court allow the statement in its entirety to come in.

\*　　\*　　\*　　\*　　\*　　\*

I want the statement to come in as it is, and if I felt that I could somehow redact it, or if this

"confession set forth the skeletal system for his defense," and that any changes to the statement would cast doubt on his credibility or truthfulness and "quickly erode" his coercion defense. In sum, Marchiafava asserts that the redacted version's references to "another person" or "the other person" would suggest to the jury that Marchiafava withheld the names of his accomplices from the government.

Marchiafava accurately characterizes his coercion defense as skeletal. A coercion defense requires evidence of "(1) immediacy of a threat of severe bodily injury or death which can be avoided only by committing a crime, ... and (2) the existence of no legal alternative to violating the law." *United States v. Allen,* 798 F.2d 985, 1004 (7th Cir. 1986) (citations omitted). We have found no evidence in the record that would support Marchiafava's claim that he was coerced to commit the arson. LaValley and Bollman's physical intimidation of Marchiafava occurred well *after* the arson. Furthermore, neither LaValley nor Bollman ever suggested to Marchiafava that he should participate in an arson scheme to earn money. Even if the jury interpreted the recurrent references to "another person" as concealment on the part of Marchiafava, such reluctance could mean that Marchiafava was fearful of revealing the identity of his accomplice or otherwise he was simply reluctant to implicate his accomplices. Such a wariness would lend credibility to Marchiafava's claim that he feared his cohorts' wrath if he failed to participate in the arson. It is also conceivable that the jury would have construed the phrase as a reference to the debt collector LaValley, and not Gio. LaValley was one of the alleged coercive influences on Marchiafava, LaValley had testified before the Marchiafava confes-

sion was admitted into evidence, and LaValley had testified that he was the person who threw the incendiary device that started the fire. LaValley also had testified at great length concerning his resort to violence as a means to insure prompt repayment of "juice" loans.

From our review we are not convinced that the admission of the redacted statement undermined Marchiafava's coercion defense and it certainly does not warrant reversal and remand for separate trials. We agree with the findings of the district court that Marchiafava was not prejudiced by the receipt of Marchiafava's redacted confession in evidence. The district court's refusal to sever the trial was not erroneous.

### B. Gio's Severance Motion

Marchiafava's detailed confession to the FBI incriminated not only himself, but also his codefendant Gio. To avoid infringing Gio's Confrontation Clause rights, the government offered to redact any references to Gio's name and replace them with the neutral phrases "the other person" or "another person." Counsel for Marchiafava wanted the statement admitted unredacted. Gio's counsel requested a severance the day before trial began. Gio maintained that more extensive redactions were required that would eliminate even general references that, when linked with other evidence, could identify Gio. After conducting a hearing on the matter and examining the statement, the court ruled that the confession would be redacted as outlined by the prosecutor. In addition, the court read a limiting instruction to the jury immediately before the confession was read to the jury.[7]

would be of some benefit to my client, perhaps I would have suggested that, but I didn't for the specific reason I don't want it redacted. Quite frankly, on behalf of my client, I cannot be concerned about what the effect of this is as far as Mr. Gio is concerned.

7. The court instructed the jury as follows:
 Evidence has been received, or in this case about to be received, concerning a statement said to have been made by the defendant Mr. Marchiafava. It is for you to determine whether that defendant, Mr. Marchiafava, did in fact make the statement. If you find that the defen-

dant Mr. Marchiafava did make the statement, then you must determine what weight, if any, you feel the statement deserves. In determining what weight, if any, should be given to the statement, you should consider all matters in evidence having to do with this statement including those concerning the defendant Joseph Marchiafava's personal characteristics and the conditions under which the statement was made.

Such a statement may not be considered by you as evidence against any defendant; namely

■ On appeal, Gio alleges that the admission of Marchiafava's redacted confession violated his constitutional right to confront his accusers. Gio argues that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), require that any reference to Gio's existence in the confession should have been redacted. In *Bruton*, the Court held that a defendant's Confrontation Clause rights were violated when his nontestifying codefendant's confession incriminating both defendants was admitted into evidence, although the trial court had instructed the jury to consider the confession against only the defendant who had confessed. The Court held in *Richardson*, however, that the Confrontation Clause is not violated when a codefendant's confession is redacted to omit any references to the defendant and the court gives a proper limiting instruction. Nonetheless, the Court explicitly stated that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Richardson*, 481 U.S. at 211 n. 5, 107 S.Ct. at 1709 n. 5.

This court, however, has specifically held that "the replacement of defendants' names with references such as 'another person,' combined with an instruction to consider the confession against only the declarant, satisfies *Bruton*." *United States v. Strickland*, 935 F.2d 822, 826 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991) (citing *United States v. Myers*, 892 F.2d 642, 647 (7th Cir.1990)); *see also United States v. Chrismon*, 965 F.2d 1465, 1472 (7th Cir.1992). The district court fully complied with our well-reasoned precedent in redacting Marchiafava's confession and in giving a limiting instruction. Gio's invocation of the "contextual implication" argument, which asks that we look beyond the confession to other evidence presented at trial to determine if Gio was incriminated, is not well-taken. The Court in *Richardson* expressly rejected this approach as susceptible "to ma-

nipulation by the defense." 481 U.S. at 209, 107 S.Ct. at 1708. Gio had no basis for requesting a severance on *Bruton* grounds. Therefore, we hold that the district court did not err in allowing in evidence the redacted confession, combined with the limiting instruction given to the jury.

### C. Admission of Marchiafava's Tape-recorded Conversations

As noted earlier, cooperating defendant De Roy engaged Marchiafava in two tape-recorded conversations in which Marchiafava implicated codefendant Gio and others in the arson. The district court found that the tapes were admissible pursuant to the statements-against-interest exception of Fed. R.Evid. 804(b)(3), and that Marchiafava's statements were inherently reliable, obviating any Confrontation Clause concerns. Gio objected to the admission of this evidence at trial and moved for a severance. Gio contends that the receipt of these tapes in evidence violated Rule 804(b)(3) because they lacked the required indicia of reliability and deprived him of his right to confront his accuser. Gio alleges that the statements were unreliable because Marchiafava's fear of LaValley caused him to blame Gio for LaValley's misdeeds.

### 1. Admission under Federal Rule of Evidence 804(b)(3)

■ Rule 804(b)(3) provides that hearsay evidence is admissible when (1) the declarant is unavailable, and (2) the statement "at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Such statements are presumed to be reliable because " 'persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true.' " *United States v. Harty*, 930 F.2d 1257, 1262 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 262, 116 L.Ed.2d 215 (1991)

---

Nicholas Gio, other than the one, namely, Joseph Marchiafava, who made it.

So the bottom line is, as Mr. Shapiro has advised you, this statement is to be considered

by you, if at all, only against Joseph Marchiafava and not against Nicholas Gio.

(quoting Notes of Advisory Committee on Proposed Rules, Rule 804(b)(3)). Under our test for admissibility first established in *United States v. Garcia*, 897 F.2d 1413, 1421 (7th Cir.1990), "a court must find that, (1) the declarant's statement was against the penal interest of the declarant, (2) corroborating circumstances exist indicating the trustworthiness of the statement, and (3) the declarant was unavailable." *Id.* at 1420; *see also Harty*, 930 F.2d at 1263.

The De Roy–Marchiafava conversations fulfilled all three requirements for admissibility under Rule 804(b)(3). Gio does not question whether Marchiafava's statements were against his penal interest, and Marchiafava's status as a defendant rendered him unavailable as a witness. Therefore, only the second prong of the *Garcia* test, the trustworthiness of the statement, is at issue on appeal.

Gio's challenge to the trustworthiness of the De Roy conversations, which he also raises in his Confrontation Clause challenge, is that Marchiafava's fear of La Valley, who actually torched the bar, caused him to lie to De Roy about who set the fire to protect La Valley. Gio's argument has no merit. First, there was no evidence presented at trial that Marchiafava was aware of LaValley's involvement in the arson. LaValley testified that he had told Bollman to inform Marchiafava that he would send someone other than LaValley to set the fire. So far as Marchiafava knew, the only arsonist involved in the scheme was Gio. LaValley also testified that while he shared the arson fee with Gio, he kept his involvement a secret from Marchiafava. In order that he might conceal LaValley's participation in the conspiracy from Marchiafava, Gio alone negotiated the arson fee with Marchiafava, while LaValley remained a "silent partner" in the scheme. Marchiafava's confession revealed that LaValley had threatened him regarding a gambling debt to Bollman, but it gave no indication that Marchiafava knew that anyone other than Gio was involved in setting the fire. Marchiafava's ignorance of LaValley's participation in setting the fire undermines Gio's claim that Marchiafava had an incentive to place blame on Gio to protect LaValley.

Most significantly, even if Marchiafava knew of LaValley's participation in setting the fire, no evidence was presented suggesting that Marchiafava feared retaliation from LaValley if he revealed LaValley's involvement to De Roy. De Roy was a co-conspirator in the arson scheme. Marchiafava could hardly have believed that he would suffer repercussions if he informed one conspirator of another conspirator's actions furthering the success of a scheme in which they each had a stake. While Marchiafava had a real and justifiable fear of LaValley's violence and his debt collection tactics, we fail to understand what reason he had to fear that LaValley would retaliate in a violent manner if he became aware that two of his partners in crime discussed his role between themselves.

Finally, other evidence presented at trial independently verified Marchiafava's statements incriminating Gio. LaValley testified that Gio assisted him in setting the fire. LaValley also testified that it was Gio who collected the arson fee from Marchiafava. In sum, there was sufficient evidence of corroborating circumstances to establish the trustworthiness of Marchiafava's statements to De Roy. The De Roy–Marchiafava conversations were admissible under Rule 804(b)(3).

2. Sixth Amendment Confrontation Clause

Gio next contends that his Sixth Amendment confrontation rights were violated by the admission of Marchiafava's hearsay statements in the De Roy–Marchiafava conversations. Gio makes the same claim in his Confrontation Clause argument that he made in his Rule 804(b)(3) challenge: Marchiafava was motivated by self-preservation to conceal LaValley's identity and wrongly accuse Gio of setting the fire.

We have adopted a two-part test for determining whether statements admitted pursuant to a hearsay exception violate a defendant's confrontation rights. First, "it must be clear that the declarant actually made the statement in question." *United States v. Blakey*, 607 F.2d 779, 786 (7th Cir.1979). Second, "there must be circumstantial evidence supporting the truth of the

statement." *Id.; see also Harty,* 930 F.2d at 1264; *Garcia,* 897 F.2d at 1421.

■ No one disputes that Marchiafava made the statements at issue, and De Roy even identified Marchiafava as a participant in the recorded conversation at trial. When considering the second part of the inquiry, we note that we have already determined that the statements were properly admitted as statements against interest under Rule 804(b)(3). The same evidence that was discussed as providing sufficient corroborating evidence also satisfies the required indicia of reliability for Confrontation Clause purposes. *See Garcia,* 897 F.2d at 1421; *United States v. Marchini,* 797 F.2d 759, 765 (9th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987). Admitting the De Roy–Marchiafava conversations in evidence did not violate Gio's Sixth Amendment confrontation right. The district court did not err in refusing to grant a severance on that basis.

### D. Sentencing Issues

#### 1. Standard of Review

■ We review the defendants' challenges to the district court's sentencing determinations under a deferential standard. *United States v. Golden,* 954 F.2d 1413, 1416 (7th Cir.1992). Factual determinations will not be reversed unless they are clearly erroneous, that is, if we are left "with the definite and firm conviction that a mistake has been committed." *Id.; United States v. Vopravil,* 891 F.2d 155, 157 (7th Cir.1989); *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989). "A question involving the interpretation of a Guidelines term, by contrast, is a matter of law subject to *de novo* review." *United States v. Cojab,* 978 F.2d 341, 343

(7th Cir.1992); *Golden,* 954 F.2d at 1416. The government has the burden of proving a specific offense characteristic justifying an enhancement of a defendant's sentence. *United States v. Guadagno,* 970 F.2d 214, 221 (7th Cir.1992); *United States v. Spillman,* 924 F.2d 721, 723 (7th Cir.1991). Whether a specific offense characteristic applies is inherently fact-specific. *Guadagno,* 970 F.2d at 221; *United States v. Bader,* 956 F.2d 708, 709 (7th Cir.1992).

#### 2. Reckless Endangerment Enhancement

■ In calculating the defendants' sentences under the Guidelines, the version of § 2K1.4 applied by the district court set forth adjustments to the base offense level based on offense characteristics, which must be determined with reasonable certainty. *See* U.S.S.G. § 2X1.1. The defendants were sentenced on March 13, 1992, but the district court applied the 1988 Guidelines when calculating the defendants' sentences. The 1988 version of § 2K1.4 that the district court applied was no longer in effect at the time of the defendants' sentencings. Courts are obliged to apply the Guidelines that are effective at the time of sentencing unless the *ex post facto* clause is violated. *United States v. Foutris,* 966 F.2d 1158, 1160 (7th Cir.1992); *Bader,* 956 F.2d at 709. The amendment to § 2K1.4 did not affect the defendants' sentences, thus we need not address the alleged error. *See Foutris,* 966 F.2d at 1160.

■ The version of the Guidelines applied by the district court provided: "If the defendant recklessly endangered the safety of another, increase by 14 levels."[8] The

---

8. The version of § 2K1.4 that the district court applied was that contained in the 1988 Federal Sentencing Guidelines Manual. The provision provided, in pertinent part:

§ 2K1.4. *Arson; Property Damage By Use of Explosives*
(a) Base Offense Level: 6
(b) Specific Offense Characteristics
If any of the following applies, use the greatest:
 \* \* \* \* \* \*
(2) If the defendant recklessly endangered the safety of another, increase by 14 levels.
 \* \* \* \* \* \*
U.S.S.G. § 2K1.4 (1988).

The version of § 2K1.4 in effect at the time of the defendants' sentencings provides:
(a) Base Offense Level (Apply the Greatest):
 (1) 24, if the offense (A) created a substantial risk of death or serious bodily injury other than a participant in the offense, and that the risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling;
 (2) 20, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) *involved the destruction or attempted destruction of a structure other than a dwelling;*

defendants argue that the district court erred in applying the fourteen-point enhancement because the arson did not endanger the safety of others. In support of this claim, defendants allege the bar that was burned was located in a rural area, LaValley made an effort to ensure the building was empty before he set it aflame with a phosphorus grenade, and no other buildings were nearby. In essence, the defendants assert that their actions in setting a rural building aflame lacked any circumstances suggesting greater danger than that which is present in *any* arson, and that the normal risks of minor fires has been factored into the base offense level. The government contends that the district court correctly determined that the reckless endangerment enhancement applies in cases where fire fighters respond to an arson fire. The government also noted that contrary to defendants' contention that the bar was in an isolated area, a dwelling was located nearby across the bar's parking lot.

While " '[nearly] all fires present some danger to firefighters, and the risks of a *minor* fire have presumably been factored into the base offense level[,]' a district judge may enhance the sentence of a defendant who is convicted of setting a fire which represents a *greater* danger to firefighters, without requiring proof that other individuals ... were also endangered." *Guadagno,* 970 F.2d at 223 (quoting *United States v. Medeiros,* 897 F.2d 13, 20 (1st Cir.1990)); *see also United States v. Day,* 943 F.2d 1306, 1311 (11th Cir.1991) (fourteen-level enhancement warranted because fire fighters and emergency personnel faced substantial risk of death and serious bodily injury, and boat that was burned was located near hotel), *cert. denied,* —— U.S. ——, 112 S.Ct. 1196, 117 L.Ed.2d 437 (1992); *United States v. Wilson,* 927 F.2d 1188, 1190 (11th Cir.1991) (fourteen-point enhancement applied where firemen who fought the blaze were substantially en-

dangered); *cf. United States v. Willey,* 985 F.2d 1342, 1347 (7th Cir.1993) (predatory nature of arson against business competitor, as well as endangerment of fire fighters and others, ample justification for upward departure). Commentary to the amended Guidelines in effect at the time of the defendants' sentencing also supported the fourteen-level enhancement. Application note 2 states: "Creating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters and other emergency and law enforcement personnel who respond to investigate an offense." U.S.S.G. § 2K1.4, comment. 2 (1991).

The sentencing court found that the fourteen-point enhancement applied because fire fighters who responded to the fire faced a substantial risk of death or serious bodily injury in battling a blaze that had been set by a phosphorous grenade. Furthermore, David J. Flatden, a detective with the Walworth County sheriff's department, testified that the pub was located in a residential area of "approximately two dozen homes." Leo Kelly, the bar owner, testified that there was a residence located east of the bar across a parking lot. Gio and Marchiafava used a phosphorous grenade to set a fire that burned intensely enough to char the entire ground floor, including the bar, seating area, and kitchen.

Defendants argue that our observation in *United States v. Golden,* 954 F.2d 1413, 1416 (7th Cir.1992), that arson of an urban structure "is virtually a per se reckless endangerment of others" precludes an enhancement where the structure was an unoccupied building in a rural area. We disagree. Contrary to the defendants' characterization, the arson did not involve a small fire in an isolated rural area. Rather, the arson involved a fire that endangered fire fighters responding to the blaze in a residential area. Further-

---

or (C) endangered a dwelling, or a structure other than a dwelling;

 (3) 2 plus the offense level from § 2F1.1 (Fraud and Deceit) if the offense was committed in connection with a scheme to defraud; or

 (4) 2 plus the offense level from § 2B1.3 (Property Damage or Destruction).

U.S.S.G. § 2K1.4 (1991) (emphasis added). This version of § 2K1.4 provides the same level of

punishment for the defendants as the version of § 2K1.4 applied by the district court (base offense level 20 under the 1991 version, as opposed to base offense level of 6 plus fourteen-level enhancement for reckless endangerment under the 1988 version). The revised guideline more precisely defines the requirements of each offense level. *See United States v. Foutris,* 966 F.2d 1158, 1163 n. 2 (7th Cir.1992).

more, that an arson involving an urban structure is "virtually ... per se reckless endangerment" does not obviate a reckless endangerment enhancement for the arson of a rural structure set afire by a phosphorus grenade. The district court did not commit clear error when finding a factual basis for applying the fourteen-point enhancement to the defendants' sentences.

### 3. Denial of Marchiafava's Request for Coercion Departure

 Marchiafava argues that the district court abused its discretion in refusing to grant a downward departure for the coercion defense pursuant to Guidelines § 5K2.12. Section 5K2.12 provides:

> If the defendant committed the offense because of serious coercion ... under circumstances not amounting to a complete defense, the court *may* decrease the sentence below the applicable guideline range.... Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. *The Commission considered the relevance of economic hardship and determined that personal financial difficulties and economic pressures upon a trade or business do not warrant a decrease in sentence.*

U.S.S.G. § 5K2.12 (emphasis added). Marchiafava asserts that the district court erroneously believed that it had no discretion to depart from the Guidelines and mistakenly stated that the evidence would not support a departure. Generally, we lack jurisdiction to review a district court's refusal to depart upward or downward from the Guidelines. *United States v. Poff,* 926 F.2d 588, 590 (7th Cir.) (en banc), *cert. denied,* — U.S. —, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *United States v. Franz,* 886 F.2d 973, 978 (7th Cir. 1989). Nonetheless, a court's "decision not to depart is reviewable on appeal if it is the product of a conclusion that the judge lacks authority to depart." *Poff,* 926 F.2d at 591; *see also United States v. Helton,* 975 F.2d 430, 434 (7th Cir.1992).

 Marchiafava's claim that the district court believed it lacked the ability to depart is belied by the record. In refusing to depart, the sentencing court stated that it "declined" to depart, not that it was unable to depart. Counsel's representation that the court improperly refused to depart because the jury's rejection of the defense precluded him from doing so is wholly inaccurate. Through careful placement of an ellipsis in a quotation taken from the sentencing transcript, counsel created the impression in his brief that the court improperly based its decision not to depart on the jury's rejection of the coercion defense at trial. When the court stated "I don't agree with your conclusion," the judge referred to defense counsel's claim that Marchiafava committed arson "for some reasons which on some level are understandable to another human being," and not to counsel's earlier argument that the jury's verdict did not preclude a departure.

We hold that Marchiafava's claim that the sentencing court abused its discretion by failing to depart downward pursuant to Guidelines § 5K2.12 must be dismissed for lack of appellate jurisdiction.

### 4. Restitution

 Finally, Gio asserts that the district court erred in requiring him to pay $65,-509.92 in restitution to Capital Indemnity Insurance Company. The only challenge Gio makes to the court's restitution order is that the court imposed full restitution despite finding that Gio had few assets and substantial liabilities. We will reverse a district court's order of restitution if it is "not improbable" that the court failed to consider the mandatory factors set forth in 18 U.S.C. § 3664. *United States v. Ahmad,* 2 F.3d 245, 246 (7th Cir.1993); *United States v. Boula,* 997 F.2d 263, 267 (7th Cir.1993); *United States v. Helton,* 975 F.2d 430, 432 (7th Cir. 1992); *United States v. Studley,* 892 F.2d 518, 532–33 (7th Cir.1989); *United States v. McClellan,* 868 F.2d 210, 212 (7th Cir.1989). "Conversely, we will sustain an order of restitution if the district court considered the requisite factors enunciated in the statute." *Helton,* 975 F.2d at 432.

The mandatory factors contained in § 3664 are the following:

the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a). In *United States v. Peden*, 872 F.2d 1303, 1310–11 (7th Cir.1989), we held that a district court must consider "the financial resources of the defendant, [and] the financial needs and earning ability of the defendant...." "[A] person actually unable to pay may be directed to make restitution, provided there is some likelihood that he will acquire resources in the future." *Ahmad*, 2 F.3d at 247; *see also Boula*, 997 F.2d at 268; *United States v. Arvanitis*, 902 F.2d 489, 496–97 (7th Cir.1990); *United States v. Mahoney*, 859 F.2d 47, 50 (7th Cir.1988); *United States v. House*, 808 F.2d 508, 510 (7th Cir.1986); *United States v. Fountain*, 768 F.2d 790, 803 (7th Cir.1985).

■ As reflected in the transcript, the sentencing court clearly considered the mandatory factors of financial resources, needs, and earning ability. At sentencing, the district court adopted the unchallenged facts contained in the Presentence Report, which identified the defendant's financial condition. The court recognized that Gio had "few assets and significant liabilities." Nonetheless, the court imposed restitution after finding that the defendant was not "totally destitute" and recognizing that Gio conceivably could come into some money during his period of supervised release following his imprisonment. The court ordered that the $65,509.92 in restitution be paid in "such amounts as determined by the Probation Department." The court did not require immediate payment, set a date for payment, or establish monthly minimum payments. Gio was only twenty-five years of age at the time of sentencing and would have the potential to earn money upon his release from prison, a portion of which could be used to reimburse the victim of his crime. The district court clearly took into account the rights of the victim insurance company as well as Gio's present and future ability to pay. We hold that the district court considered the requisite factors set forth in 18 U.S.C. § 3664 and fashioned an appropriate restitution order.

■ Although the district court complied with § 3664(a) when ordering restitution, our holdings in *Boula*, 997 F.2d 263, and *Ahmad*, 2 F.3d 245, compel us to conclude that the district court gave the probation office too much discretion for the management of the restitution order. In *Boula*, the district court ordered that the defendants "pay Restitution in the amount of FIVE MILLION ($5,000,000) when released from custody in a manner to be suggested by the probation officer and when [they have] the capacity to do so." 997 F.2d at 269. We vacated the order because "the district court left too much discretion for the management of the restitution order in the hands of the probation department." *Id.; see also Ahmad*, 2 F.3d at 248–49 ("Section 3663 does not permit a district judge to delegate to the administrative staff the specification of a payment schedule...."). We stated that a sentencing court "must make clear in its order [of restitution] that it is retaining supervision and control over the defendant[ ], including the payment of restitution, and that any problems encountered in the enforcement of the order, by either the probation department or the defendants, must be brought to the sentencing judge's attention for resolution by him." *Boula*, 997 F.2d at 269; *see also Ahmad*, 2 F.3d at 249.

*Boula* and *Ahmad* require us to vacate Gio's order of restitution. The language in Gio's order of restitution is essentially the same as the language that was used in the orders in *Boula* and *Ahmad*. The order provides that Gio must pay "in installments according to the following schedule of payments: payments are to be made in such amounts as determined by the Probation Department." The order in *Boula* stated that the defendants were to pay restitution "in a manner to be suggested by the probation officer." Furthermore, the order in this case is similar to the order in *Boula* because it does not provide that the district court will retain supervision and control over the defendant, and it does not instruct the probation

office that if the ordered restitution proves to be too onerous, the defendant and his probation officer should return before the court. The order of restitution entered against Gio suffers from the same deficiencies as the order we deemed insufficient in *Boula*.

### III. CONCLUSION

We VACATE the district court's order of restitution entered against defendant Gio and REMAND with instructions to enter an order consistent with this opinion. In all other respects, the defendants' convictions and sentences are AFFIRMED.